## OPPENHEIMER *v.* BANK.

### (*Jackson.* June 12, 1896.)

1. APPEAL., *Brings up entire case.*

   An appeal by the unsuccessful party alone brings up the entire case for review and determination, where the decree below enjoins the collection of a fraudulent note in the hands of a purchaser before maturity, upon the ground that it was unnegotiable, but held that appellant purchased without notice of the fraud. (*Post, pp. 20–23.*)

2. BILLS AND NOTES. *Innocent holder.*

   The purchase from strangers, at a discount of twenty per cent., of a note, one maker of which was known to be perfectly solvent, does not charge a bank with constructive notice of fraud in procuring the note, when the bank was accustomed to discount notes of solvent parties at from twelve to twenty-five per cent. per annum. (*Post, pp. 23–26.*)

   Cases cited: Hunt *v.* Sanford, 6 Yer., 387; Merritt *v.* Duncan, 7 Heis., 163.

3. SAME. *Providing for attorney's fees negotiable.*

   A note is not rendered non-negotiable by a stipulation for the payment of attorney's fees for its collection, which is entirely inoperative until after the maturity of the note and its dishonor by the maker. (*Post, pp. 26–33.*)

   Case cited: Parham *v.* Pulliam, 5 Cold., 497.

4. SAME. *Extent of recovery by innocent holder.*

   The *bona fide* holder of a note procured by fraud can recover only to the extent of the sum actually paid by him for it. (*Post, pp. 33–35.*)

Oppenheimer *v.* Bank.

Cases cited and approved: Petty *v.* Hannum, 2 Hum., 102; Hole-
man *v.* Hobson, 8 Hum., 127; May *v.* Campbell, 7 Hum., 450;
Green *v.* Stuart, 7 Bax., 422.

FROM GIBSON.

Appeal in error from Chancery Court of Gibson
County.  A. G. HAWKINS, Ch., sitting by interchange.

McDEARMON & KILLOUGH, COOPER & HARWOOD,
and NEIL & DEASON for Oppenheimer.

W. M. McCALL and W. I. McFARLAND for Bank.

McALISTER, J.   Complainants filed this bill to
enjoin the defendant bank from prosecuting three sev-
eral suits before a Justice of the Peace, for the
collection of certain promissory notes.   It is charged
in the bill that said notes were procured by fraud
and are without consideration, and that the bank
received the notes from the payees with actual or
constructive notice of the fraud.   It is further charged
said notes were not negotiable, for the reason that
each contained a stipulation for the payment of rea-
sonable attorney's fees, and that said bank is not
protected in its title to said notes as an innocent
holder for value in due course of trade.   The Chan-
cellor, upon final hearing, was of opinion that the
defendant bank purchased said notes without actual

or constructive knowledge of the fraud, but held that the stipulation in respect of attorney's fees, destroyed the negotiability of said instruments, and thereby defeated the claim of said bank; that it was an innocent holder for value within the meaning of the law merchant. The Court decreed that said notes had been procured by fraud and were void in the hands of defendant bank, and perpetually enjoined their collection. The bank appealed, and has assigned as error the action of the Chancellor in adjudging said notes non-negotiable on account of the stipulation in respect of attorney's fees.

The facts out of which the present controversy has arisen may be briefly stated. The record discloses that Curtis Bros. were the proprietors of a patent churn, which they were engaged in selling in Gibson County. Complainants purchased of Curtis Bros. the exclusive right to sell this churn in the State of Louisiana and certain counties of Mississippi, for which they agreed to pay the sum of $2,000, evidenced by four notes, each for the sum of $500, and payable, respectively, in seven, eight, nine, and ten months from date. The following is a specimen of the notes in controversy, viz.:

"TRENTON, TENN., June 3, 1889.

"Nine months after date we promise to pay to the order of Curtis Bros., or bearer, the sum of five hundred dollars, negotiable and payable at the Exchange Bank of Trenton, Tenn., for value received. The drawers and indorsers severally waive present-

ment for payment, protest, and notice of protest and nonpayment of this note, and, in case of suit, agree to pay all reasonable attorney's fees for collecting the same.

"$500 due February 3, 1890.

"L. OPPENHEIMER,

"C. T. LOVE,

"R. F. ROSS,

"H. R. CAMP."

On the twenty-seventh and twenty-eighth of June, 1889, three of these notes were purchased by the defendant bank at a discount of twenty per cent.—that is to say, the bank paid twelve hundred dollars for the three notes of the aggregate face value of fifteen hundred dollars. H. R. Camp, one of the signers of the notes, was in the employment of Curtis Bros. in the capacity of salesman, and negotiated the sale to Oppenheimer of the exclusive right to sell this churn in Louisiana and Mississippi. It was agreed between the original parties, at the time the notes were executed, they were not to be transferred, and were alone payable out of the profits of the new business. Curtis Bros., Camp, and Ames, soon after the execution of the notes, left the State clandestinely, and their whereabouts is unknown. The proof abundantly shows that Curtis Bros. were in collusion with Camp, and that said notes were procured to be executed upon false and fraudulent representations, and as between the original parties there was a total failure of consideration. The defendant

Oppenheimer *v.* Bank.

bank, however, relies upon the plea of innocent purchaser for value before maturity, in due course of trade, and without notice. Defendant's counsel insist that, complainant not having appealed from the ruling of the Chancellor that the bank had no actual or constructive notice of the fraudulent conduct of the payees in procuring the execution of the notes, this question cannot be reopened in this Court. But this position is manifestly erroneous, since, upon the appeal of the bank, the whole case is open for reexamination, and if the decree in favor of complainant is found correct upon any ground, although incorrect upon the ground assigned by the Chancellor, we should affirm it.

The contention of learned counsel for complainant is that the purchase of the notes in suit from strangers at a discount of twenty per cent., when the bank knew that Oppenheimer, one of the makers, was perfectly solvent, indicates knowledge of the fraud, or that the bank had such constructive notice as to put it upon inquiry. As said by this Court: "When the indorsee takes negotiable paper before maturity under circumstances which might reasonably create a suspicion that it was not good—as, where he buys a note on a solvent man, having less than one year to run, for $333.33 at $125, with an agreement to pay $25 more if collected without suit, he takes it at his peril and subject to the equities between the original parties." *Hunt* v. *Sanford*, 6 Yer., 387; 7 Heis., 163.

Says Mr. Tiedeman, in his work on Commercial Paper, Sec. 291: "It is said that inadequacy of price paid for negotiable paper may be so gross as to justify the conclusion that the purchaser is charged with notice of a fraudulent or defective title on the part of the vendor. And it has been held there was constructive notice of fraud or of some other equally effective defense to the paper where the purchaser paid $125 for a note of $333.33, $50 for a note of $300, $5 for a note of $300. On the other hand, it has been held that the purchaser of a commercial instrument was a holder for value, and hence took it free from equitable defenses, when he paid $100 for a note of $250, $50 for a note of $100, or $12.50 for a note of $25. It is certain that a purely nominal consideration would not make the purchaser a holder for value. And it may be stated, subject to an explanation of terms, that an inadequate price always puts the person upon inquiry and may, certainly, along with other suspicious circumstances, charge him with notice of existing defenses. But every price is not inadequate which is less than the face value of the instrument purchased. Commercial paper of every kind has its commercial value, rising above or falling below par, according to the financial credit of the person liable on it. Only that price is inadequate which falls below the market value, and if the disproportion between the price paid and the market value be very great, it is fair and just to presume that the pur-

chaser had reasonable grounds for suspecting fraud or some other defense to the instrument. Each case must, therefore, stand on its own merits. One-half the face value may, under some circumstances, be a grossly inadequate price, while, under different circumstances, it may be greatly in excess of what the instrument is worth on the market." Tiedeman, Sec. 291.

We think the rule laid down by Mr. Tiedeman is sound, and furnishes an intelligible basis for the determination of what constitutes inadequacy of price in the purchase, of commercial paper. We cannot say, however, in view of this rule and the proof in the record, that there was any such gross disparity between the commercial value of the notes and the price actually paid, as to awaken suspicion in the minds of the officers of the bank of any infirmity in the paper. The proof shows that this bank was accustomed, during this time, to discount paper at rates varying from twelve to twenty-five per cent. per annum, and that it had, prior to this time, discounted paper held by these payees on other solvent parties at such rates. It was also insisted in argument that H. R. Camp, one of the makers of the notes, negotiated the sale of this paper to the bank, and that this fact was sufficient to put the purchaser upon inquiry. Nothing can be predicated upon this position, for the reason that it does not distinctly appear from the record whether it was Ames or Camp who sold the notes to the bank. The officers

of the bank who purchased the paper, are unable to state which of these parties conducted the transaction, and there is no other proof in the record on the subject. We hold, however, this feature unimportant in this case. We find no facts or circumstances in the record fixing the bank with knowledge, actual or constructive, of the fraudulent character of the paper, and the holding of the Chancellor in respect of this proposition is correct.

The next question presented is whether the stipulation in respect of payment of attorney's fees, written in the face of the note, destroys its negotiability and thus dismantles the note, allowing proof of fraud in its execution. The question presented has given rise to much judicial controversy, and the decisions announced in different States and jurisdictions are by no means reconcilable, and, since the question is one of first impression in this State, we shall, after a review of the authorities, adopt that view which most commends itself to our reason and judgment.

Mr. Tiedeman, in the work already cited, Commercial Paper, Sec. 28 (*b*), says: "Bills and notes, particularly the latter, sometimes contain stipulations that, if not paid voluntarily, the drawer or maker will pay the attorney and collection fee. It has been much discussed what is the effect of such a stipulation upon the legal character of the instruments to which they are added.

"A few decisions maintain that the stipulation is in the nature of a usurious charge and avoids the

whole transaction under the laws prohibiting usury."
Citing *State* v. *Taylor*, 10 Ohio, 378; *Shelton* v.
*Gill*, 11 Ohio, 417; *Dow* v. *Updike*, 11 Neb., 95.

It may be remarked under this head that, in the
case of *Parham* v. *J. J. Pulliam, Ext. etc.*, 5
Cold., 497, this Court held that a stipulation in a
note to pay attorney's commission for collecting is
not usurious. Other decisions hold the stipulation to
be void because it is in the nature of a penalty
and tends to the oppression of impecunious debtors.
But the avoidance of the stipulation on such grounds
enables the Courts to treat the stipulation as mere
surplusage and hold the instrument to be negotiable
notwithstanding." Citing 77 Pa. St., 131; 84 Pa.
St., 410; 92 Pa. St., 227; 84 N. C., 24; 63 Mo.,
23; 64 Mo., 477; 71 Mo., 618, 622, 627; 53 Wis.,
599; 27 Minn., 240; 14 Bush, 814; *Meyer* v. *Hart*,
40 Mich., 517; *Bulloch* v. *Taylor*, 39 Mich., 138;
*Garr* v. *Louisville Banking Co.*, 11 Bush, 182.

"In a large number of cases the stipulation is held
to be valid, but because it renders the gross sum
to be recovered on the instrument uncertain, its in-
sertion in a bill or note is declared to destroy its
negotiability." Citing *Sweeney* v. *Thickstrew*, 77 Pa.
St., 131; *Woods* v. *North*, 84 Pa. St., 410; *Johnston*
v. *Spear*, 92 Pa. St., 227; *First National Bank* v.
*Bynum*, 84 N. C., 24; *First National Bank* v.
*Gay*, 63 Mo., 33; *Samstag* v. *Conley*, 64 Mo., 477;
*First National Bank* v. *Marlow*, 71 Mo., 618; *Storr*
v. *Wakefield*, 71 Mo., 622; *First National Bank* v.

*Gay,* 71 Mo., 627; *Morgan* v. *Edwards,* 53 Wis., 599; *Jones* v. *Radtiz,* 27 Minn., 240.

"There are also other cases which not only recognize the validity of the stipulation, but also the negotiability of the paper in which it appears." Citing *Dietrich* v. *Baylie,* 23 La. Ann., 767; *Overton* v. *Matthews,* 35 Ark., 147; *Smith* v. *Muncie National Bank,* 29 Ind., 159; *First Nat. Bank* v. *Canatsey,* 34 Ind., 149; *Johnston* v. *Crossland,* 34 Ind., 344; *Smith* v. *St. Silvers,* 32 Ind., 321; *Wyant* v. *Parttorff,* 37 Ind., 512; *Hubbard* v. *Harrison,* 38 Ind., 325; *Wilkes* v. *Woollen,* 54 Ind., 164; *Sperry* v. *Harr,* 32 Iowa, 184; *Seatin* v. *Scoville,* 18 Kan., 435; *Howestien* v. *Barnes,* U. S. C. C., Kansas, 28 Am. Rep., 406 (S. C., 5 Dillon, 482);; *Heard* v. *Dubuque Bank,* 8 Neb., 10; *Farmers' National Bank* v. *Rasmusson,* 1 Dakota, 60; *Wilson Sweny Machine Co.* v. *Moreno,* U. S. C. C., Oregon, 29 Am. Rep., 406 (S. C., 7 Fed. Rep., 806); *Storieman* v. *Pyle,* 35 Ind., 103. Indiana now prohibits by statute such stipulations in notes unless unconditional. Rev. Stat. (1876), 149.

Mr. Tiedeman remarks that where the amount to be recovered as attorney's fees is explicitly stated in the instrument, it would seem that the sum of money to be recovered on the paper, with the attorney's fees added to the principal and interest, would be as certain as the principal and interest would be alone, for the interest continues to accumulate if the paper is not honored at maturity. When the exact

amount of the fee is not stated, only reasonable fees can be recovered, and there may be some ground for objecting to the negotiability of such an instrument. But it would seem that even such an instrument ought to be held negotiable, for the stipulation for reasonable attorney's fees renders the amount no more uncertain than the addition by the law merchant to the principal sum of the costs of protest and the taxed costs of the suit.

Mr. Randolph, in his work on Commercial Paper, Vol. I., Sec. 205, in treating this subject, says: "The effect of a stipulation for attorney's fees or costs of suit contained in a note has been the subject of much consideration, more especially in our Western States. As an agreement and irrespective of usury laws and other statutory prohibitions, such a stipulation is in itself valid." Citing *Meacham* v. *Penrose,* 60 Miss., 217; *Brown* v. *Barber,* 59 Ind., 533; *First Nat. Bank* v. *Breese,* 39 Iowa, 640; *Garver* v. *Pontorris,* 66 Ind., 191; 42 Ind., 176; 61 Ind., 276; 47 Ind., 559; 85 Ind., 317; *Miner* v. *Paris Exchange Bank,* 53 Texas, 559. "And the fees so stipulated for may be recovered by the holder of the notes, although not the original payee." Citing *Johnson* v. *Crossland,* 34 Ind., 334. "And where a stipulation of this sort is contained in a bill of exchange, it has been held to be embraced in the liability assumed by the acceptor." *Bank of British North America* v. *Ellis,* 2 Fed. Rep., 44; 29 Ind., 158.

"It may be said in general," says the author, "that such a stipulation for fees does not affect the negotiability of the note containing it, even though the stipulation be restricted to the case of suit being brought on the instrument." Citing 1 Daniel Neg. Instrument, 66; 2 Parson's Bills and Notes, 147; *Dietrich* v. *Baylie*, 23 La. Ann., 767; *Heard* v. *Dubuque Co. Bank*, 8 Neb., 10, 24; *Sperry* v. *Horr*, 32 Iowa, 184; *Seaton* v. *Scoville*, 18 Kan., 433; 7 Fed. Rep., 806; 16 Fed. Rep., 89; *Trader* v. *Chichester*, 41 Ark., 242; *Gaar* v. *Louisville Banking Co.*, 11 Bush, 180; *Nicherson* v. *Sheldon*, 33 Ill., 372; and citing also the Indiana cases, *Davidson* v. *Vorse*, 52 Iowa, 384; *McGill* v. *Griffin*, 32 Iowa, 445; Randolph on Com. Paper, Vol. III., §§ 1717, 1718; Chitty, 770.

Says Mr. Daniel, in his work on Negotiable Instruments, Sec. 62 (*a*): "Such instruments should, we think, be upheld as negotiable. They are not like contracts to pay money and do some other thing. They are simply for the payment of a certain sum of money at a certain time, and the additional stipulation as to attorneys' fees can never go into effect if the terms of the note or bill are complied with. They are, therefore, incidental and ancillary to the main engagement, intended to assure its performance or to compensate for trouble and expense entailed by its breach. At maturity negotiable paper ceases to be negotiable in the full commercial sense of the term, as heretofore explained, though it still passes

from hand to hand by the negotiable forms of transfer, and it seems paradoxical to hold that instruments evidently framed as bills and notes are not negotiable during their currency because, when they cease to be current, they contain a stipulation to defray the expenses of collection. Such stipulations do not, we think, render such instruments usurious. The additional amounts are in consideration of additional trouble and expense inflicted on the holder, and not excessive interest for the loan or forbearance of money." The author states further that the cases sustaining the negotiability of such instruments consider that the stipulation in respect of attorneys' fees is valid because it is an indemnification assured by the maker against the consequences of his own act, for, unless in default, he will not have to pay the additional amount; that it is consonant with public policy, because it adds to the value of the paper; has a tendency to lower the rate of discount, not only because it promises less expensive collection, but bears evidence of a greater degree of confidence on the part of the maker in his ability to pay without suit, and that it does not impair the negotiability of the instrument, for the reason that the sum to be paid at maturity is certain; that commercial paper is expected to be paid promptly; that, if so paid, no element of uncertainty enters into the contract; that it ceases to be negotiable in the full sense of the term if not paid at maturity, and that the addi-

tional agreement relates rather to the remedy upon the note, if a legal remedy be pursued, than to the sum which the maker is bound to pay," etc. 2 Daniel on Neg. Ins. (3d Ed.), Sec. 62.

This doctrine has received the indorsement of such eminent jurists as Mr. Justice Brewer, now an Associate Justice of the United States Supreme Court, who said, in the case of *Seaton* v. *Scoville*, 18 Kan., 781, viz.: "It seems to us, therefore, a just conclusion that paper otherwise negotiable is not rendered non-negotiable by a stipulation for the payment of costs of collection, including attorneys' fees, in case suit is brought thereon." Justice Brewer cited with approval the case of *Gaar* v. *Louisville Banking Co.*, 11 Bush (Ky.), 180 (S. C., 21 Am. Rep., 709), in which it was said, viz.: "The reason for the rule, that the amount to be paid must be fixed and certain, is that the paper is to become a substitute for money, and this it cannot be unless it can be ascertained from it exactly how much money it represents. As long, therefore, as it remains a substitute for money, the amount which it entitles the holder to demand must be fixed and certain; but when it is past due, it ceases to have that peculiar quality denominated negotiability, or to perform the office of money; and hence, anything which only renders its amount uncertain after it has ceased to be a substitute for money, but which in nowise affected it until it had performed its office, cannot prevent its becoming negotiable paper."

Oppenheimer *v.* Bank.

Upon a careful review of the authorities, we can perceive no reason why a note, otherwise endowed with all the attributes of negotiability, is rendered non-negotiable by a stipulation which is entirely inoperative until after the maturity of the note and its dishonor by the maker. The amount to be paid is certain during the currency of the note as a negotiable instrument, and it only becomes uncertain after it ceases to be negotiable by the default of the maker in its payment. It is eminently just that the creditor who has incurred an expense in the collection of the debt, should be reimbursed by the debtor by whose default the action was rendered necessary and the expense entailed. So far from such a stipulation discounting the negotiability of the instrument, we think, with Mr. Daniel, that it is an indemnification assured by the maker against the consequences of his own act; that it is consonant with public policy because it adds to the value of the paper; has a tendency to lower the rate of discount, not only because it promises less expensive collection, but bears evidence of a greater degree of confidence on the part of the maker in his ability to pay without suit.

We are, therefore, of opinion the decree of the Chancellor adjudging said notes non-negotionable was erroneous. We hold, however, that, these notes being fraudulent in their inception and without consideration between the original parties, the bank will only be entitled to recover to the extent of the sum

13 P—3

actually paid by it, to wit, the sum of $1,200 and interest. In other words, we hold there was a negotiation of the notes in due course of trade only to the extent of the amount actually paid. *Petty* v. *Hannum*, 2 Hum., 102; *Holeman* v. *Hobson*, 8 Hum., 127; *May* v. *Campbell*, 7 Hum., 450; *Green* v. *Stuart*, 7 Baxter, 422.

The reason of this rule is thus stated by Mr. Daniel, viz.: "When the execution of a bill or note has been induced by fraud, a different rule applies. The *bona fide* holder of it, for value and without notice, is undoubtedly entitled to be protected against a loss which would befall him if the party defrauded were permitted to set up the defense of fraud on the part of the payee against him. But it does not, therefore, follow that he may recover of such party the whole amount, when he has paid a less sum. For his protection and security against loss, it is only necessary that he should be paid back the amount which he was induced to give for the instrument by its appearance of validity, and, therefore, such amount is the limit of his recovery against the drawer or maker who was defrauded into the execution of the instrument. . . . The paper derives its vitality wholly from the circumstance that it has been obtained for value without notice by an innocent purchaser. For his protection, it is maintained in his hands as a legal obligation. The object of the law is to save him from loss, and, to do that, a recovery of the amount he may advance is all that

Oppenheimer *v.* Bank.

can be required. To go beyond it would be inequitable and unjust to the party after that equally entitled to be protected from loss." Daniel on Negotiable Instruments, Vol. I., Sec. 758; *Todd* v. *Shelbourne*, 15 N. Y.