## W. B. PIGG v. HOUSTON & LIGGETT.

Middle Section. August 3, 1928.

Petition for Certiorari denied by Supreme Court, February 9, 1929.

McGugin, Evans & Cate, of Nashville, for appellant.
Robert C. Armstrong, of Lewisburg, for appellee.

FAW, P. J.  W. B. Pigg brought this suit on April 29, 1924, in the chancery court of Lincoln county, against Houston & Liggett, a partnership composed of C. C. Houston and W. G. Liggett.  Houston & Liggett, Inc., a corporation, and R. H. Harwell, a resident of Marshal county, Tennessee, were also made defendants to the bill; but the suit against the corporate defendant (Houston & Liggett, Inc.) and R. H. Harwell was abandoned before final decree in the chancery court.

The complainant sought an injunction and an attachment by his bill, but these features of the case seem to have been also abandoned below.  At any rate, the Chancellor made no decree with respect to the injunction or the attachment, and no complaint of the decree has been made on that ground, either in the chancery court or in this court.

Complainant alleges in his bill, in substance, that, during the year of 1923, he sawed 455,610 feet of lumber for defendant Houston & Liggett pursuant to an oral contract between complainant and defendant Houston & Liggett, by the terms of which contract defendant agreed and promised to pay to complainant for such sawing the sum of 75 cents per one hundred feet (board measure) of lumber sawed; that during the same period of time complainant had, at defendants' request, paid out on defendant's account the sum of $204.75 for labor employed in loading lumber on the cars; and that, after allowing all just credits to which defendant is entitled,

defendant is indebted to complainant in the sum of $2568.45, for which sum, and for costs, complainant prayed for judgment.

Complainant further alleges in his bill (as a statement of the terms of the aforesaid contract) that, a short time prior to January 1, 1923, R. H. Harwell, an agent of the defendant firm of Houston & Liggett, and acting in its behalf, "called complainant" and said to him, substantially, "what about getting you to do some sawing for me, I am behind;" that complainant expressed a willingness and ability to do the sawing, which was to be done at Petersburg (in Lincoln county), Tennessee, and complainant "entered into a contract at the time with the defendant Harwell, whereby it was agreed that the complainant was to saw the logs at Petersburg, at the price of 75 cents per one hundred feet board measure of lumber sawed, the defendants, through Harwell, agreeing to measure the lumber each day as sawed and keep the same moved out of the way of the mill, the complainant to have the right to and to saw for his customers custom sawing as it came to him in the meantime."

Defendant Houston & Liggett, the partnership, answered the bill and admitted that, acting through its agent R. H. Harwell, it made a contract with complainant whereby complainant agreed to saw and convert into lumber some logs which defendant had purchased and intended to purchase in the vicinity of complainant's saw mill, and which would be delivered on complainant's saw mill yard, but defendant averred that said contract was made about the middle of January 1923, and not at the time alleged in the bill."

Defendant denied that a contract was made between complainant and defendant as set out in complainant's bill, and defendant averred that the contract made between complainant and defendant in January, 1923 bound defendant to pay complainant for sawing and converting the logs into lumber as measured and shipped by defendant, and defendant denied that it was a part of the contract that the lumber was to be measured each day as sawed, as alleged in the bill.

Defendant admitted that it was a part of the contract that complainant would have the right to do custom sawing for other parties in the vicinity of his mill, if he so desired.

Defendant denied that complainant had sawed 455,610 feet of lumber for defendant, or anything approximating that number of feet, and denied that it owed complainant $2568.45, or anything like that sum. Defendant averred that it had overpaid complainant to the amount of $23.27 for sawing the lumber which had been measured and delivered to defendant for shipment, but defendants' answer contains a further paragraph as follows:

"It is true as alleged in the bill that there is still lumber cut by complainant for respondents on the yard of complainant, and this lumber may amount to 40,000 or 50,000 feet, and when the same is measured and shipped, complainant will be entitled to a saw bill on this at 75 cents per one hundred feet and for the sake of argument, granting there is 50,000 feet, your respondents would owe complainant on this lumber $375. And heretofore having over paid complainant $23.27, which should be applied as a credit on the $375, would leave your respondents indebted to complainant in the sum of $351.73, and they here tender same with this answer by certified check, stating to the court that if complainant objects to this tender upon the ground that it is not legal, upon notice of said objection, they will gladly pay the money into court.

Both the bill and the answer contained numerous details with respect to the making of the contract, the things done thereunder by the respective parties, and the amount of the balance due complainant as claimed by the parties, respectively, but we think we have stated enough of the pleadings to disclose the ultimate determinative issues thereby presented.

A considerable volume of proof, with numerous exhibits, was filed on behalf of the parties, respectively, and the case was finally heard by the Chancellor, when a decree, which embodied the Chancellor's finding of facts, was entered as follows:

"This cause came on for hearing before the Honorable Thomas B. Lytle, Chancellor, etc. on the whole record in the case, including the pleadings, exhibits, and depositions of the witnesses, and all exhibits thereto, from all of which the court is of the opinion and finds as facts the following:

"That on or about the first of the year, 1923, the defendants, Houston & Liggett, a partnership, through their agent, R. H. Harwell, contracted with the complainant, W. B. Pigg, for him to saw some hardwood lumber for them, the price of sawing to be 75 cents per hundred feet, the actual measurements of the boards or lumber to be taken as they came from the mill, the same to be measured each day by Harwell, as sawed by the complainant, and moved out of complainant's way; that under this plan, arrangement and contract, the complainant sawed for the defendants before the contract was terminated about the first of the year, 1924, three hundred and forty-three thousand one hundred seventy-seven (343,177) feet, amounting, at 75 cents per hundred, to $2573.83; that the complainant also paid out for the defendants, Houston & Liggett, the sum of $205.20 in cash for labor, etc. making a total accruing or due

to be paid the complainant by Houston & Liggett during the year and under the contract, $2779.03; that Houston & Liggett paid to the complainant in cash, by a saw, and by the proceeds of cull lumber sold by complainant, etc., total credits or amounts of $1348.36; that there was due the complainant from the defendants, Houston & Liggett, therefore, at the time of the filing of the bill in this cause the sum or balance of $1430.67, on which the complainant is entitled to interest from the time of the filing of the bill, April —, 1924, or $178.83, making a total of $1609.50, now due the complainant.

"It is, therefore, considered, ordered, adjudged and decreed that complainant, W. B. Pigg, have and recover of the defendants, C. C. Houston and W. G. Liggett, partners under the firm name and style of Houston & Liggett, they having submitted to the jurisdiction of the court, said sum of $1609.50 and all the costs of the cause, for which let execution issue.

"To all of the foregoing, the defendants except and pray their appeal to the next or the present term of the Court of Appeals, sitting at Nashville, Tennessee, which appeal is granted upon condition as required by law, and for apparent satisfactory reasons, on their application, they are allowed thirty (30) days from this date within which to make out and file the same.

"To the action of the court in not granting the complainant a recovery in the sum of more than $1609.50 the complainant excepts.

"Either party may make up, have signed and file his or their bill of exceptions within thirty (30) days from this date."

The appellant Houston & Liggett perfected its appeal and has assigned errors. The appellee W. B. Pigg did not appeal, but has assigned errors upon certain rulings of the Chancellor.

Without reference at this point to the sufficiency of his assignments, it may be said that the appellee in this case is within his rights in assigning errors, although he did not appeal. Where there is a broad and unlimited appeal by one of the parties in a chancery case tried according to the forms of the chancery court. and the decree of the appellate court will necessarily affect the parties who have not appealed, the whole case is open for trial de novo in the appellate court. State ex rel. v. Bolt, 130 Tenn., 212, 218, 169 S. W., 761; Oppenheimer v. Bank, 97 Tenn., 19, 23, 36 S. W. 705; Wilson v. Scruggs, 7 Lea, 635, 641; Parsons v. Kinzer, 3 Lea, 342, 352; Grubb v. Browder, 11 Heisk., 299, 303; Carnes v. Polk, 5 Heisk., 244, 250; Wood v. Cooper, 2 Heisk., 441, 454; Morris v. Richardson, 11 Humph., 389, 392. And in such case the appellee may assign er-

rors upon rulings of the chancery court adverse to him. Taylor v. Elgin, 140 Tenn., 602, 610, 617, 622, 205 S. W. 428.

As a consequence of the rule that on appeal a chancery case is tried de novo, the parties occupy the same attitude, that is, as complainant and defendant, in this court as in the chancery court. We shall, therefore, so designate them in this opinion, and not as "complainant in error" and "defendant in error," as they are frequently described in the brief for defendant.

Four of the five assignments of error filed on behalf of complainant Pigg are directed to the action of the Chancellor in overruling objections of complainant to evidence offered for defendant Houston & Liggett, and are as follows:

"1. The Chancellor erred in overruling the complainant's objection to the evidence of Harwell, that is his questions Nos. 17 to 20, inclusive, and question No. 39, and the answers thereto in his direct examination, wherein he purports to tell his conclusions of what the contract was without telling what was said and done at the time it was made. Tr. p. 251.

"2. The Chancellor erred in overruling complainant's objections to the books or ledger introduced by the defendant, and questions Nos. 78 to 90, inclusive, and the answers thereto in the direct examination of Harwell because both are shown to have been based upon hearsay evidence because the alleged account is not itemized, because no witness testified as to its accuracy. Tr. pp. 251-252.

"3. The Chancellor erred in overruling the objections of the complainant to the evidence of the witness Alford under questions Nos. 108 to 109, inclusive, and the answers thereto, because the same does not purport to state what occurred between the parties but only the witness' conclusions. Tr. pp. 252-253.

"4. The court erred in overruling complainant's objections to the evidence of the witness Fitzpatrick, given in answer to questions Nos. 15 to 18, inclusive, and Nos. 22 to 29, inclusive, and Nos. 31 to 33, inclusive, and the answers thereto, in his direct examination, and to the exhibits to his evidence, because all are shown to have been based upon hearsay evidence and not upon the knowledge of the witness, the hearsay being reports made to him by Harwell. Tr. pp. 254-258."

The four assignments just quoted, standing alone, are not in compliance with the rules of this court and the Supreme Court governing assignments of error, which rules require that "when the error alleged is to the admission or rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected,

with citation of record where the evidence and ruling may be found.'' 155 Tenn., Appendix pp. V and XII; Wood v. Green, 131 Tenn., 583, 586, 175 S. W., 1139; Gorrell v. Mayor etc., of Newport, 1 Tenn. Chy. App. R., 120, 133; Thompson v. Evans, 2 Tenn. Chy. App. R., 61, 66; Haire v. Smith, 5 Hig., 304, 306; Nance v. Smyth, ·118 Tenn., 349, 351, 99 S. W., 698.

But complainant's assignments of error are accompanied by a brief (the assignments and brief being physically bound together as one document) which, in part, supplies the omissions in the assignments of error and, when considered along with them, cures some of their infirmities, and, in that view, we will consider such of complainant's assignments of error as are thus sufficiently supplemented, under the authority of Wallace v. Goodlett, 104 Tenn., 670, 58 S. W. 343, wherein it was held that when an assignment of error, not in itself specific and definite, is accompanied by a brief that is full, definite and explicit, the two papers will be taken and considered as one, and together constitute a sufficient compliance with the rule of the Supreme Court as to assignments of error.

It should be stated, parenthetically, that the name of the witness ''Alford'' in the complainant's third assignment of error, supra, is manifestly the result of a clerical or typographical error, and was intended to be Harwell. The deposition of the witness Alford does not contain as many as 108 questions, but the deposition of R. H. Harwell does contain questions numbered 108 and 109, with answers thereto, and these particular questions and answers in the deposition of R. H. Harwell, with complainant's objections thereto and the ruling of the Chancellor overruling the objections, appear on the pages of the transcript cited under the complainant's assignment of error. We shall, therefore, treat said assignment as relating to questions and answers numbered 108 and 109 in the testimony of the witness R. H. Harwell.

The defendant's assignments of error make it necessary for us to ascertain from the proof (1) what was the contract between complainant and defendant, and (2) how many feet of lumber did complainant saw for defendant under contract. It is also necessary to answer the latter question in order to respond to complainant's fifth assignment of error. It is, therefore, obviously proper that we should first dispose of complainant's assignments of error directed to the rulings of the Chancellor in admitting evidence on behalf of defendant over complainant's objection, in order that the evidence to which objection was thus made may, if held inadmissible, be excluded from the record and not considered by this court in the determination of the issues of fact.

The complainant's first assignment complains of the admission of certain testimony of the witness R. H. Harwell purporting to

state some of the terms of the contract between complainant and defendant. It appears, without dispute, that the contract was made by means of a telephone conversation between complainant and Harwell, the latter being the general agent of the defendant and his authority unquestioned.

The testimony of Harwell to which complainant's first assignment is directed is included in excerpts from Harwell's deposition as follows:

"Q. 17. Now, in your own way, tell me the contract that you made with Mr. Pigg to saw logs for Houston & Liggett. A. Well, we—

"Q. Question objected to by Mr. Evans:

"We had at that time more logs at Petersburg than we could take care of, more than we could get sawed up before Spring came and we called Mr. Pigg. I knew he had this sawmill there and I wanted him to—he was at home and I asked him what would be the chance to get him to saw some 50 or 60,000 feet of logs. He said alright, I asked him what he would charge for sawing this amount. He said about 65 cents. He said he was sawing at that time little dribbles for this fellow and that fellow and was charging them 75 cents per one hundred but where he could get that much sawing together why he knocked off 10 cents on the hundred and he traded with me with that understanding, that he was to get a sawyer to man his mill for him and I named the people that he should hire—he was to hire Ed Moore, or J. D. Moore, one of the two. He started out and hired this sawyer in the beginning and he let him go. Well, I got after him about the way my lumber—

"Q. 18. That is not answering my question, Bob, that will come later. See if I understand you correctly. You made a trade with him and the terms of the trade was that he was to saw such logs as you delivered to his mill at 65 cents a hundred. A. Yes sir.

"Q. 19. Now, what character of timber was he to saw the logs into? A. He was to cut it into lumber by specifications that we saw for the market, that is, for manufacturing hardwood floors and automobiles.

"Q. 20. What was said, if anything, about when he was to receive his pay? A. Well, the trade was that the lumber was to be measured when we shipped it; that we were to take all the measurements that we got from the inspectors we were selling to.

"Q. 21. When did he commence sawing under this contract then? A. Well, it was sometime in February.

"Q. 22. Now, then when the logs were delivered to his yard what were the specifications that you gave him regarding the kind of lumber that it should be converted into? A. Well, at first, it was hard maple and it was to be cut two and two and one-half inches thick and the two-inch lumber was to be cut one-eighth full and two and one-half one-fourth full and the oak was to be cut one inch, one-eighth full.

"Q. 23. What was the length of these? A. Well, it ran in lengths from eight to sixteen feet long.

"Q. 24. Now, at this time, when you made the contract did you agree with Mr. Pigg to measure the lumber each day after it was sawed? A. No sir.

"Q. 25. Now, after the making of the contract, were the terms changed in any manner, if so, tell me the changes. A. Well, Mr. Pigg complained of not making any money and I knew he was not making any money and he added and made the price 75 cents instead of 65 cents.

. . . . . . . .

"Q. 38. Now, were you to pay Mr. Pigg for sawing upon the basis of the log measurements or not? A. No sir.

"Q. 39. How were you to pay him? A. I was to pay him the lumber measured that is just the measurements we were selling to when it was taken up for shipment.

"Q. 40. Now, what about the cull lumber? A. I was to pay him for sawing all the cull.

"Q. 41. And who was to measure the cull lumber? A. Well, there was not anything said about who was to measure the cull when we traded."

Specific objection was made by complainant to the statement of the witness Harwell, in his answer to question 17, supra, that "he traded with me with that understanding that he was to get a sawyer to man his mill for him." This objection is not material, for the reason that complainant Pigg did not deny, but substantially admitted, the truth of this statement of Harwell.

For the same reason, the objection to question and answer No. 18 is overruled; that is to say, complainant and Harwell agree in their testimony that when the contract was first made complainant agreed to saw for defendant at the rate of 65 cents per one hundred feet, and that subsequently the contract was altered by mutual agreement so that defendant was to pay complainant at the rate of 75 cents per one hundred feet for all the sawing done on the contract.

Complainant objected to the admission of the answers to questions 19, 20 and 39 in the foregoing testimony quoted from Harwell's deposition, on the ground that said testimony "states conclusions of the witness and does not purport to state exactly what was said between the parties."

The objection thus made is tantamount to a contention that a witness to an oral contract cannot testify to its terms unless he can state the exact words used by the parties in making the agreement. Such a rule would be too rigid, and would frequently tend to defeat justice, because of the well-known frailty of the human memory in the matter of remembering the exact words uttered by the parties to a conversation, particularly after a considerable lapse of time.

The answers of Harwell to the questions numbered 19, 20 and 39, supra, were "collective statements," made in colloquial language, of certain terms of the contract, as the witness understood and remembered the meaning and significance of the words used by complainant and himself at the time the agreement was made, and the Chancellor did not err in overruling complainant's objection thereto.

"In order to avoid prolixity it is permissible, and frequently desirable, for a witness to make a collective statement of facts; then if the other side wishes to go into the details they may be brought out on cross-examination." 13 Corpus Juris, p. 767; Elliott v. Stocks, 67 Ala., 290, 297, 301; Woodstock Iron Co. v. Reed & Partlow, 84 Ala., 493, 494, 4 So., 369; Mobile, etc., Railroad Co. v. Worthington, 95 Ala., 598, 605, 10 So., 839.

"On an issue as to the terms of an oral agreement, it has been held proper to permit one of the parties thereto to state how he understood the matter." 3 Ency. of Ev., p. 520; Linsley v. Lovely, 26 Vt., 123. Complainant's first assignment of error is overruled.

Complainant's second assignment of error challenges the action of the Chancellor in overruling complainant's objections to the admission in evidence (as an exhibit to Harwell's deposition) of the defendant's "ledger" and certain testimony of Harwell purporting to identify, verify and explain same. The assignment specifies the questions numbered 78 to 90, inclusive, and the answers thereto, in Harwell's deposition, as the testimony to which the assignment is directed, but of said questions and answers the bill of exceptions preserves objections only to those numbered 78, 79, 80, 82, 89 and 94, and the "ledger" exhibited therewith; but, in order that the testimony thus designated may be better understood, we quote the questions and answers numbered 75 to 94, inclusive, as follows:

"Q. 75. You say you kept a book? A. I did.

624

"Q. 76. I now hand you a black book called a ledger. Tell me what you know about that book and is that the book that you kept over there? A. Yes, sir, it is.

"Q. 77. I notice on page 138 of this book an account you might call it under the name of Mr. Pigg and there are entered so many feet of lumber shipped and so many feet of culls. Did you make those entries on that book yourself? A. I did.

"Q. 78. Now then, I ask you to state whether or not that account as it appears on that page shows all of the lumber that was measured and shipped during 1923 cut by Mr. Pigg's mill? A. It does.

"Q. 79. Now then, I notice that Houston & Liggett sold some culls and Pigg sold some culls according to that book, is that right? A. Yes, sir.

"Q. 80. Now Bob, when that book was closed for the year was there any other lumber or culls that had been cut by Pigg's mill during 1923 that had not been shipped and, therefore, not measured? A. Yes, sir.

"Q. 81. Now, where was that lumber, or culls located? A. It was all on Mr. Pigg's yard except about 7000 feet. It was stacked on Houston & Liggett's yard.

"Q. 82. See if I understand you correctly—the ledger that I am examining you about shows the lumber including culls that was cut by Mr. Pigg and measured and disposed of in 1923 except what remained on Pigg's yard and a small amount that was on Houston & Liggett's yard at the close of the year 1923. A. Yes, sir.

"Q. 83. Now, I notice on the other side of this account various credit items purporting to be some of them to be paid by check and other credit items of culls sold by Mr. Pigg—did you make these entries on the book? A. I did.

"Q. 84. Did you give Pigg the checks that you have set out there and have charged against him on this account? A. I did.

"Q. 85. Now then, these culls that were sold by Mr. Pigg did you or not receive that information from Mr. Pigg? A. Yes, sir.

"Q. 86. Did he tell you what he got for the culls? Is that the way you arrived at charging him with so many feet of culls at a certain price a hundred feet? A. Yes, sir.

"Q. 87. Now then, I notice here also that Houston & Liggett on that saw mill account takes credit for a saw—$141.12; labor paid to J. E. Moore $13.32; lumber sold by Pigg $196.37 —why did you charge him with this saw?

"By Mr. Evans: It is admitted he bought the saw for us and should be charged to us.

"Q. 88. Now, here are two items amounting to $196.37 charged against Pigg for lumber sold? How could you get that charge—the facts upon which to make it? A. Mr. Pigg gave it to me.

"Q. 89. Now this account as it appears on page 138, I believe you say, was all made by you? A. It was.

"Q. 90. And shows the transactions between Houston & Liggett and Mr. Pigg for the year 1923? A. Yes sir.

"Q. 91. Is this account entitled to any more credits? A. Yes sir.

"Q. 92. What other credits? A. For the balance of the lumber that was shipped out in '24.

"Q. 93. When you made Mr. Pigg these various payments did he request you to make them or did you do it voluntarily? A. I did it by his request.

"Q. 94. I am now asking you to file this book marked 'R. H. Harwell—Ledger' as Exhibit No. 1 to your deposition."

Complainant's objections to such of the above quoted questions and answers as were the subject of specific objections, and his objections to the "ledger," are stated in his bill of exceptions as follows:

"Complainant objects to questions Nos. 78, 79, 80 and 82, 89 and 90 in the direct examination of witness Harwell on the ground that said questions and answers are incompetent, the witness not having made the measurements purported to be entered on the book in question, nor been present when they were made, and the original measurement records by Alford and Clouse not being offered in evidence and neither Clouse nor Alford purporting to testify to the accuracy or correctness of any of the items entered on said alleged account.

. . . . . . . .

"The complainant objects to the alleged ledger and the account therein on page 138 filed as Exhibit No. 1 to the deposition of R. H. Harwell under Question No. 94, said ledger and account being the same above referred to, on the same grounds of the last above objection. Said alleged account is incompetent because it does not purport to have itemized entries of the measurements it is alleged to show; it was not made and kept by the party or parties making the measurements; witness Harwell who purported to keep the account did not make the alleged measurements; neither Clouse nor Alford who are alleged to have made the measurements proposes to testify to the

accuracy or correctness of any of the items on said account; said account on its face does not purport to be an account made and kept as the transactions occurred; said account is not verified by nor shown to correspond with said alleged measurements; said items of measurements alleged to be entered in said account by the witness Harwell and the correctness thereof are hearsay evidence as to him; for all these reasons said account and all of the evidence in regard thereto are incompetent as a ledger account or book account.

"Overruled and complainant excepts.

"Thos. B. Lytle, Chancellor."

In order to test the competency or incompetency of the evidence challenged by complainant's second assignment of error, supra, it is proper to take into view certain other evidence in the record with respect to the manner in which defendant obtained the measurements of the lumber sawed for defendant by complainant and preserved a record thereof. When the lumber came from the saw it was stacked until dry and ready for shipment (usually a period of approximately ninety days) and then, as it was taken from the stack and loaded on the cars, it was measured by the witness Howard Alford, who was employed by defendant as lumber inspector during the year of 1923, acting in conjunction with another inspector employed by the purchaser to whom defendant had sold the lumber. The "culls" were not loaded on the cars, but were measured when reached in the course of handling the lumber and a separate account thereof was kept by Alford.

The measurements thus made by Alford and the purchaser's inspector were by them written on "slips of paper" as the measuring proceeded, and these "slips of paper" were turned over to R. H. Harwell daily by Alford. Harwell was the general agent of defendant Houston & Liggett, and as such had full control of the defendant's business at Petersburg. The first shipment of lumber sawed by complainant for defendant was measured by Alford and the witness W. R. Clouse (the latter representing the purchaser) on April 21, 1923, and from that time until August 15, 1923, Harwell, according to his testimony, entered all measurements turned over to him by Alford as aforesaid in a small "pocket ledger" which he (Harwell) carried in his pocket. After thus making the entries in his "pocket ledger," Harwell made no further effort to preserve the "slips of paper" turned over to him by Alford, and they were lost or destroyed.

On the last named date (August 15, 1923), Harwell transferred the totals of "lumber shipped" and "culls" from his said "pocket ledger" to the large "ledger" (sometimes described in the record

as the "black book") now in controversy, by opening an account
on page 138 thereof in the name of W. B. Pigg, and under the head-
ing "Lumber shipped and cull," he made the first two entries as fol-
lows:

"April 21 to Aug. 15. 53186 shipped ...............$398.89.
"April 21 to Aug. 15. 5172 cull ................... 38.79."

A number of entries, in chronological order, follow the above
quoted entry, each of which was made by Harwell and purports
to be the measurement of a shipment or of "culls."

Harwell testified that he transferred the account of the lumber
sawed by complainant from his "pocket ledger" to the large ledger,
or black book, in the manner aforesaid, for the reason that he had
worn out the small book in his pocket; that he had "got it ragged,"
and the backs were "all lost;" and he says that, after transferring
the totals of the Pigg lumber as stated, he destroyed the worn out
"pocket ledger," believing it to be of no further use.

. Without reference at this time to the evidential weight of the
ledger account in controversy, we are of the opinion that .it was
admissible in evidence. The substance of complainant's objections
thereto is that the entrant, Harwell, the only witness who testifies
to the correctness of the account, did not make the measurements
and "said items of measurement alleged to be entered in said ac-
count by the witness Harwell and the correctness thereof are hear-
say evidence as to him."

Modern business conditions and methods demand, and for several
decades have been receiving, at the hands of the courts, a relaxation
of the former rigid rules which excluded well-nigh everything
savoring of hearsay. "Mercantile and Industrial life, producing, as
they do, nearly all the transactions of men that come before the.
courts of law and equity, are essentially practical. That which is
the final basis of action, of calculation, reliance, investigation, and
general confidence in every business enterprise, may safely, in gen-
eral, be resorted to to prove the main fact. The courts need not
discredit what the common. experience of mankind relies upon."
10 R. C. L., pp. 861-862.

Professor Wigmore concludes a discussion of the subject of "reg-
ular entries" as an exception to the hearsay rule, as follows:

"The conclusion is, then, that where an entry is made by
one person in the regular course of business, recording an oral
or written report, made to him by one or more other persons
in the regular course of business, of a transaction lying in the
personal knowledge of the latter, there is no objection to re-
ceiving that entry under the present exception, provided the
practical inconvenience of producing on the stand the numer-

ous persons thus concerned would in the particular case outweigh the probable utility of doing so. Why should not this conclusion be accepted by the courts? Such entries are dealt with in that way in the most important undertakings of mercantile and industrial life. They are the ultimate basis of calculation, investment, and general confidence in every business enterprise; nor does the practical impossibility of obtaining constantly and permanently the verification of every employee affect the trust that is given to such books. It would seem that expedients which the entire commercial world recognizes as safe could be sanctioned, and not discredited, by courts of justice. When it is a mere question of whether provisional confidence can be placed in a certain class of statements, there cannot profitably and sensibly be one rule for the business world and another for the court-room. The merchant and the manufacturer must not be turned away remediless because methods in which the entire community places a just confidence are a little difficult to reconcile with technical judicial scruples on the part of the same persons who as attorneys have already employed and relied upon the same methods. In short, courts must here cease to be pedantic and endeavor to be practical.'' Wigmore on Evidence, Vol. 2, sec. 1530, pp. 1895-1896).

The principle thus enunciated by Professor Wigmore is, in substance, recognized as sound by our Supreme Court in the following cases: Graham v. Life Association, 98 Tenn., 48, 54, 37 S. W., 995; Continental National Bank v. First National Bank, 108 Tenn., 374, 380, 68 S. W., 497, and Burns v. City of Nashville, 142 Tenn., 541, 610-611, 221 S. W., 828.

In the last cited case, the court cited with approval Heike v. U. S., 227 U. S., 331, 57 L. Ed., 450, wherein it was held that books in which were entered the weights of importations of sugar by city weighers were admissible in evidence, without calling the weighers who had made the entries to prove the books; and in this case (the Heike case) the court cited in support of its ruling on this point 2 Wigmore on Evidence, sections 1521 and 1530.

The Tennessee case of Continental National Bank v. First National Bank, supra, was cited and followed in the case of Heid Bros. v. Commercial National Bank (Texas), 240 S. W., 908, 24 A. L. R., 904, 910. See also Kuennan v. U. S. Fidelity & Guaranty Co., 159 Mich., 122, 123 N. W., 799; Chisholm v. Beaman Machine Co., 160 Ill., 101, 43 N. E., 796; Mississippi River Logging Co. v. Robson, 69 Fed., 773, 16 C. C. A., 400, 408; Culver v. Marks (Ind.), 7 L. R. A., 489, 494; 9 Ency. of Law (2 Ed.), pp. 912, 913, 918, 919.

An elementary rule requires the production of "the best evidence of which the case, in its nature, is susceptible." But, "in requiring the production of the best evidence applicable to each particular fact, it is meant, that no evidence shall be received, which is merely substitutionary in its nature, so long as the original evidence can be had. The rule excludes only that evidence, which itself indicates the existence of more original sources of information. But where there is no substitution of evidence, but only a selection of weaker, instead of stronger proofs, or an omission to supply all the proofs capable of being produced, the rule is not infringed." 2 Jones on Evidence (2 Ed.), sec. 753, p. 1397, quoting from Greenleaf on Evidence, sec. 82.

The "slips of paper" on which the lumber inspectors kept the record of the lumber measured by them and the small "pocket ledger" in which Harwell first transcribed from the slips of paper a part of the measurements furnished to him by the inspectors were voluntarily destroyed by Harwell under the circumstances before stated; but "it is the general rule that one who has destroyed a written instrument may introduce secondary evidence to prove its contents, although the destruction thereof was voluntary and deliberate, if in destroying the instrument he acted either upon an erroneous impression as to the effect of his act, or under circumstances which rendered the act free from all suspicion of intentional fraud." 10 R. C. L., p. 916, sec. 74. To same effect, see 2 Jones on Evidence (2 Ed.), sec. 826, p. 1512.

"Books of account have always been regarded as a species of secondary evidence, admissible in favor of the party keeping them because of the necessities of the case, not because they are the best evidence of the transactions recorded in them." Jones on Evidence (2 Ed.), sec. 767, p. 1423.

"Since a book of accounts transcribed from other accounts or memoranda is a book of original entry only when the primary accounts or memoranda were merely temporary, it follows that copies of accounts taken from books of original entry cannot be regarded as matter of original entry and as a general rule are not admissible in evidence. An exception to the rule that copies are inadmissible arises where the original books have been lost or destroyed, or are in the possession of a nonresident. Yet copies or transcripts of books of account should not be received unless the proof shows that the originals themselves have been so kept as to be themselves admissible, were they produced within the rule allowing the use of a party's books as evidence in his own favor." 10 R. C. L., p. 1176, sec. 374.

Without further discussion of the point, we are of the opinion that the ledger account exhibited and identified by the witness Harwell, and Harwell's testimony relating thereto, which constitutes the basis of the complainant's second assignment of error, were competent and admissible evidence, and that assignment of error is overruled.

Treating the reference to "the witness Alford" in complainant's third assignment of error as intending the witness Harwell, this assignment complains of the Chancellor's action in overruling complainant's objection to the questions and answers numbered 108 and 109 in Harwell's deposition.

It appears that, about the time the bill in this case was filed, the complainant and Harwell had a conference in Petersburg with a view of endeavoring to adjust and settle the matter here in controversy. There is an irregularity in the numbering of the questions in Harwell's first direct examination; that is to say, the questions are numbered consecutively to, and including, 108, and the question next following is numbered 103, and from that point the questions are numbered consecutively, so that there are two questions numbered 108 in Harwell's first direct examination (one of them on page 162 and the other on page 163 of the transcript), but the bill of exceptions identifies the answer to the question first numbered 108 as the one to which (or to a part of which) the objection was made, and which question and answer are as follows:

"Q. 108. Now tell me what transpired between you and Mr. Pigg in Scott's office. A. Well, I went over my book with him and we went from there then to Mr. Pigg's yard, mill yard, and Mr. Alford and myself tried to estimate the lumber that was on Mr. Pigg's yard that had not been measured and we did the best we could at it—it was in such a shape it was simply a guess instead of an estimate and it was agreed that we would take that estimate that we agreed on there and add it to the amount on the books and settle with him with this understanding—if the lumber was measured up why if it did not measure out as much as we estimated to be there he was to pay the Company the difference and if it measured up over the Company was to pay him the difference."

The "book" mentioned in the answer just quoted is the defendant's ledger or "black book" to which reference has already been made. Harwell states that he showed the various items in that book (on page 138) to complainant Pigg, and that "he (Pigg) agreed that the charges were all correct." Complainant says, in support of his third assignment of error, that the statement of Harwell in his answer to question 108, supra, that "it was agreed that we would take that estimate that we agreed on there and add it

to the account on the books and settle with him with this understanding,'' and his further statement, in answer to question 109, that ''he agreed that the charges were all correct,'' both purport ''to state the conclusion of the witness instead of what actually occurred,'' and that this testimony was, therefore, incompetent and inadmissible.

The statements of the witness thus challenged are ''collective statements'' of fact, and the Chancellor's action in refusing to exclude them is supported by the authorities heretofore cited in that part of this opinion disposing of complainant's first assignment of error. The complainant's third assignment is therefore overruled.

Through his fourth assignment of error complainant says the Chancellor erred in overruling complainant's objection to certain questions and answers, and the exceptions thereto, in the direct examination of defendant's witness Paul Fitzpatrick, ''because all are shown to have been based upon hearsay evidence, and not upon the knowledge of the witness, the hearsay being reports made to him by Harwell.''

Paul Fitzpatrick was the General Manager of defendant's ''lumber operations'' in Tennessee during the year 1923, with his office at Lewisburg in Marshall county. The material features of the several parts of Fitzpatrick's testimony to which the objections were directed, are four exhibits numbered two, four, five and six, respectively.

Exhibit numbered two purports to be a statement, or ''copy,'' of what defendant's books at the defendant's home office at Lewisburg ''show the production of the three mills amounted to.'' Mr. Fitzpatrick testified that ''there was not any record kept in the home office of the amount of feet that was produced at the Pigg mill;'' that ''Mr. Harwell would advise the amount of lumber loaded in the car, as to how much of it came from each of these three mills, and that is the record we have in the home office of what we got from Pigg's mill.'' It is obvious that exhibit numbered two was made up from statements furnished by Mr. Harwell, and, as we have seen, Mr. Harwell had in his possession and introduced in evidence the account kept by him, as far as it related to the lumber sawed by complainant for defendant; and, therefore, exhibit numbered two to Fitzpatrick's deposition does not fall within any recognized exception to the hearsay rule of which we are aware, and it should not have been admitted in evidence.

Exhibit numbered four to Fitzpatrick's deposition purports to be a bundle of ''invoices'' each of which purports to be an invoice of a car of lumber shipped by defendant Houston & Liggett from Petersburg on a named day in the year 1923, but there is nothing

about these invoices which tends to show where any of the lumber thus invoiced was sawed—whether at Pigg's mill or Houston & Liggett's mill or Moore's mill. In the absence of evidence showing how much lumber sawed at Houston and Liggett's mill and at Moore's mill was shipped from Petersburg in 1923, said invoices throw no light on the issues in this case. Moreover, the record does not show the source of the information upon which these invoices were made up, and the complainant's objection thereto should have been sustained.

Exhibit numbered five to Fitzpatrick's deposition purports to be a statement showing the number of feet of lumber sawed by Pigg's mill that was shipped in 1924. This information was evidently furnished by Harwell and the record thereof in the Lewisburg office was hearsay and should have been excluded.

Exhibit numbered six to Fitzpatrick's deposition, which purports to be a summarized statement of the account of Houston & Liggett with W. B. Pigg was inadmissible for the same reasons stated above for the exclusion of exhibits two, four and five.

For the reasons stated complainant's fourth assignment of error is sustained, and we will not consider the testimony of Paul Fitzpatrick, and the four exhibits thereto, challenged by that assignment of error.

Complainant's fifth (and last) assignment of error is that ''The Chancellor erred in not giving complainant credit for having sawed the total sum of 455,610 feet of lumber as alleged in his bill, and especially in not having given him credit for having sawed the total of 438,640 feet, instead of 343,177 feet, and, therefore, in not granting the complainant a decree for the corresponding increased net amount.''

Complainant's fifth assignment, supra, may be considered in connection with the defendant's assignments of error, which are as follows:

(1) ''The court erred in finding and holding that the contract entered into between Harwell, agent of Houston & Liggett, and complainant in the court below, W. B. Pigg, provided that the lumber sawed each day for Houston & Liggett at Mr. Pigg's mill should be measured each day and moved out of Mr. Pigg's way.''

(2) ''The court erred in finding and holding that Mr. Pigg cut or sawed for Houston & Liggett from January, 1923 up to about January 1, 1924, 343,177 feet of lumber, for which he should receive 75 cents per 100 feet.''

(3) ''The court committed error in rendering a judgment or decree in Mr. Pigg's favor against Houston & Liggett for $1609.50 and costs of suit.''

(4) "The court committed error in not finding, holding and decreeing that Mr. Pigg, under the contract, only cut 185,028 feet, and that Houston & Liggett was indebted to him only in the sum of $252.07."

As hereinbefore indicated, we think the answers to two questions of fact will dispose of all of defendant's assignments of error and complainant's fifth assignment. These two questions are (1) what was the contract between complainant and defendant, and (2) how many feet of lumber did complainant saw for defendant under the contract.

The general nature of the contract and the manner in which it was made have already been indicated. The point of controversy is, whether, by the terms of the contract, defendant agreed to measure the lumber each day as sawed and keep it moved out of the way of the mill, as testified by complainant, or that the agreement was that the lumber should be measured when ready to ship, and as shipped, as testified by Harwell.

The burden was on complainant to prove the contract as alleged in his bill, in so far as it was denied by the answer. Complainant's testimony on the controverted point is met by the opposing testimony of Harwell, and Harwell is strongly corroborated by the practical construction placed on the contract by the conduct of the parties. The undisputed proof shows that no part of the lumber was measured as it came from the saw, but it was all stacked, or "ricked," on Pigg's mill yard where it remained until it was ready for shipment (usually a period of about 90 days), when it was measured and loaded on the cars. Complainant states, in his testimony, that he did not at any time ask Harwell to measure any of the lumber, but that Harwell asked him to "rick it for him" and he did so, and that he helped load the lumber on the cars and knew that it was measured at that time. Such was the unbroken custom throughout the entire operation of the contract.

"The acts of the parties in the execution of a parol agreement are the best guides for its interpretation." 2 Elliott on Contracts, sec. 1538.

"The best evidence of how the parties to an agreement understood its terms is afforded by their acts under it, and these may be shown in order to aid the court in arriving at a proper interpretation." Pratt v. Prouty, 104 Ia., 419, 65 Am. St. R., 472, 474.

"Parties are far less liable to have been mistaken as to the meaning of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences "have impelled them to resort to

law, and one of them then seeks a construction at variance with the practical construction they have placed upon it of what was intended by its provisions.'' 6 R. C. L., page 853, sec. 241.

See also 2 Williston on Contracts, sec. 623; State ex rel. v. Vanderbilt University, 129 Tenn., 279, 329, 164 S. W., 1151; Canton Cotton Mills v. Overall Co., 149 Tenn., 18, 29, 257 S. W., 398; Chicago v. Sheldon, 76 U. S., 50, 54, 19 L. Ed., 594, 596.

We are of the opinion, and find, that the record supports the defendant's contention with respect to the time when the lumber was to be measured, and that the learned Chancellor erred in his finding that the lumber sawed by complainant for defendant was to be measured by Harwell each day as it came from the mill.

The materiality of the controversy with respect to the time when the lumber was to be measured grows out of the fact that lumber not sawed sufficiently "full" will, when dried, shrink to an extent that, under an established rule and custom of the lumber trade, will require a reduction in the dimension which reduces the cubic content of each board thus improperly sawed. Complainant was to saw the lumber in accordance with specifications furnished by defendant, and there is proof tending to show that much of the lumber sawed by complainant for defendant did not conform to the specifications, in that, it was not sufficiently "full." For example: a board exactly two inches thick when green and fresh from the saw will ordinarily measure less than two inches after it has been dried, and is reckoned as an inch and a half thick by lumber inspectors.

The remaining inquiry is how many feet of lumber did complainant saw for defendant under the contract? Complainant alleges in his bill that he sawed 455,610 feet (board measure) of lumber for defendant. The Chancellor found that the number of feet of lumber thus sawed by complainant for defendant was 343,177 feet. The record does not disclose the method of computation by which the Chancellor arrived at the result above stated, or the particular evidence, or line of evidence, upon which he based his finding in this respect.

Complainant does not offer any evidence purporting to show measurements of the lumber in question. His testimony is to the effect that he began sawing logs for defendant in January, 1923, and between that time and the first of July of that year he operated his saw mill eighty-five days; that his mill would saw on an average 3000 feet of lumber per day, and that during this period he sawed 20,000 feet for persons other than defendant. 3000 feet per day for eighty-five days would amount to 255,000 feet, and, deducting 20,000 feet, the result is 235,000 feet which, on this theory, com-

plainant claims that he sawed for defendant prior to July 1, 1923. Complainant operated his saw mill with a 16-horse-power traction engine which he used between June 25th and a day in August for threshing grain. In August complainant resumed the operation of his mill, and sawed logs for complainant (and for other persons also) until sometime in the fall of 1923—the exact date of the cessation of the operation of his mill not appearing.

Beginning early in the year 1923, complainant measured the logs of defendant delivered at his (complainant's) mill by the Scribner rule for measuring logs. This was done to enable Harwell to settle with the persons from whom he bought the logs. Complainant turned these measurements over to Harwell. Complainant testifies that he did not keep a record of these measurements, after turning them over to Harwell, prior to July 1, 1923, but that thereafter he kept a "duplicate" of the measurements of all of defendant's logs thus measured by Scribner's rule; which rule is designed to ascertain (by measuring the length of the log and its diameter at the smaller end) the number of feet of boards which may be sawed from a log. Complainant and other witnesses introduced by him testified that a log measured by Scribner's rule will "gain" from twenty per cent to thirty-five per cent in the sawing; that is to say that the number of feet of manufactured lumber which may be sawed from a log will exceed the calculation made by Scribner's Rule of the number of feet in the log to that extent.

Complainant testified that the logs of defendant placed on his (complainant's) mill yard after July 1, 1923, measured (by Scribner's rule) 169,700 feet, and complainant claims that defendant was liable to him for "sawing 169,700 feet of lumber actually counted by Scribner's measure plus usual gain of thirty percent, or a total of 220,610 feet."

It is in the manner just stated that complainant forms his estimate that he sawed for defendant 235,000 feet prior to July 1st and 220,610 feet after July 1st, making a total of 455,610 feet.

The proof tends to show that the number of feet of lumber which complainant's mill (a small mill) would saw in a given time was affected by many circumstances and subject to numerous contingencies.

The evidence also tends to show that Scribner's rule is based on a straight, sound log, approximately twenty-four to thirty inches in diameter, and that small, defective logs will usually lose rather than gain.

It appears that Houston & Liggett has a saw mill at Petersburg much larger than that of defendant and better equipped for handling and sawing large logs, and that only small logs were delivered to complainant's mill for defendant.

It further appears that, because of inferior sawing by complainant's mill, which experience disclosed, a considerable number of the larger and better logs placed on complainant's mill yard were removed to, and sawed by, defendant's mill, and that many of the logs sawed by complainant's mill were "hollow, crooked and knotty chestnut and maple logs."

Many witnesses were examined on behalf of the parties, respectively, and it would unnecessarily extend this opinion to review their testimony herein.

Holding as we do that the record kept by Harwell was competent evidence, we think it is the most reliable evidence in the record of the number of feet of lumber sawed by complainant for defendant and measured in accordance with the terms of the contract. Harwell's book account (in his ledger or "black book") shows a total of 150,932 feet. To this should be added the lumber still on the yard at the time the bill was filed, and afterwards measured, which amounted to 34,096 feet, making a total of 185,028 feet.

There seems to be no controversy now concerning the credits to which Houston & Liggett are entitled, viz: $1351.94. The amount due when the bill was filed was, therefore, less than the sum tendered by defendant and paid into court with its answer, viz: $351.73.

It results that the complainant's fifth assignment of error is overruled, and the defendant's assignments of error are sustained. Judgment will be entered for complainant Pigg and against defendant Houston & Liggett for the sum of $351.73 (the sum tendered by defendant), but the judgment to be satisfied and discharged by the tender.

The costs accrued prior to the tender will be adjudged against the defendant Houston & Liggett, and the remaining costs of the case, including the costs of the appeal, will be adjudged against the complainant Pigg.

Crownover and DeWitt, JJ., concur.