Taylor v. Elgin.

## Della Taylor *et al. v.* F. S. Elgin.

## (*Jackson.* April Term, 1918.)

1. **MORTGAGES.** Mortgage distinguished from sale.

Where a mortgage was foreclosed, and the property purchased at the foreclosure sale for mortgagor's benefit, under an oral agreement that mortgagor might redeem within reasonable time at price bid and ten per cent. profit, together with an attorney's fee, or that the property might be resold, the balance, after deducting price bid, the profit, and the fee, to be paid over to mortgagor, the transaction constituted a mortgage and not a sale with liberty of repurchase. (*Post, pp.* 615, 616.)

Cases cited and approved: Bennet v. Holt, 10 Tenn., 6; Scott v. Britton, 10 Tenn., 215; Lowry v. McGhee, 16 Tenn., 242; Hickman v. Cantrell, 17 Tenn., 183; Ballard v. Jones, 25 Tenn., 455; Ehert v. Chapman, 67 Tenn., 27; Blizzard v. Craigmiles, 75 Tenn., 693; Bowman v. Felts, 42 S. W., 810; McGan v. Marshall, 26 Tenn., 121; Krelinger v. New Patagonia, etc., 6 British Ruling Cas., 394; Haywood v. Ensley, 27 Tenn., 460.

2. **MORTGAGES.** Foreclosure. Redemption. Interest.

Where land was purchased at foreclosure sale for the benefit of the mortgagor under an agreement to allow him to redeem, on an accounting by the purchaser, an allowance of ten per cent. interest on the sum advanced in accordance with the agreement was properly refused; defendant being entitled only to six per centum. (*Post, pp.* 616, 617.)

3. **MORTGAGES.** Foreclosure. Redemption. Attorney's fees.

Where property was purchased at foreclosure sale for the mortgagor's benefit, under an agreement to allow him to redeem, an allowance of $750 attorney's fees, according to the agreement of the parties, was properly refused, where no services were performed for which the charge could be made. (*Post, pp.* 616, 617.)

Taylor v. Elgin.

4. **MORTGAGES. Foreclosure. Redemption. Expenditures.**
Where property purchased at foreclosure sale under an agreement for the mortgagor's benefit, whereby a resale was allowed, a commission to a broker effecting the resale was properly allowed, in an action against the first purchaser for an accounting. (*Post, pp.* 616, 617.)

5. **APPEAL AND ERROR. Assignment of errors.**
Matters not contained in assignment of errors by appellee are not rendered reviewable by general discussion or even particular objection made later in the general argument accompanying the assignment of errors. (*Post, pp.* 617-622.)

FROM SHELBY

Appeal from the Chancery Court of Shelby County.—Hon. F. H. Heiskell, Chancellor.

J. H. Malone, R. M. Heath and Turley & Turley, for appellant.

Caruthers Ewing and T. K. Riddick, for appellees.

Mr. Chief Justice Neil delivered the opinion of the Court.

We find the following facts clearly and satisfactorily established by the record:

In 1907 John W. Taylor, of Corinth, Miss., being then the owner of a house and lot situated on Shelby street, in Memphis, Tenn., conveyed this property to his wife, complainant Della Taylor. When the property was purchased by Mr. Taylor, it was subject to a mortgage of $5,000 in favor of Williamson

Bros. This mortgage, as between Taylor and his vendor, was assumed by Taylor, and his conveyance to his wife was subject to the mortgage. This mortgage secured certain notes, payable at different deferred dates in the sums of $500, and one of $3,000, and provided that in case any note should not be paid when due, all should mature. Mr. Taylor failed to pay one of the $500 notes, and the whole debt was declared due, and the property advertised for a sale, to take place on September 5, 1908. Negotiations were then begun by Mr. Taylor through his friend W. F. Wallace, also of Corinth, Miss., with a view to procuring some one to buy the property and carry it for a time for the benefit of his wife, until they could redeem it. Defendant, who had formerly lived at Corinth, and was a brother-in-law to Wallace, was requested to undertake the matter. He, at that time, was acting as agent for Mrs. Taylor in the renting of the property, and, by calling in the aid of a company engaged in that business, in fact secured a tenant in the person of one Stall. Defendant declined to undertake the matter when applied to, but referred Taylor and Wallace to his brother W. F. Elgin, also of Corinth. Defendant and his brother, shortly after this, contemplated buying the property on their own account, but Taylor persisted in his effort to save it, and secured from defendant and his brother an agreement which will be presently stated. One C. W. Young, about this time, became an important figure in the transaction. He had sold

the property to Taylor, but, having executed the mortgage and being personally bound on the notes, was concerned to see that it brought a sufficient amount to relieve him of liability. Knowing also that Taylor and his wife were in embarrassed circumstances financially, and that they would probably not be able to buy at the sale, he had prepared himself to purchase it, not only to save his own liability, but as a speculative venture, regarding the property as of very much greater value than the mortgage debt. Just before the sale, however, he was informed by Wallace, and by Taylor, and also by Williamson, that the property was to be bought in for the benefit of Mrs. Taylor. He thereupon decided to abandon his purpose of bidding at the sale, but, to assure himself that matters would take the course indicated, he attended, and, before the bidding began, again asked Wallace whether the plan referred to was to be carried out. Wallace assured him that it would be. There was nobody present at this time, but the defendant and his brother, W. F. Elgin, W. F. Wallace, Sam L. Williamson, Mr. Young, and one of the trustees, Mr. Holloway. The two Elgins were near enough to hear the conversation between Young and Wallace, and they do not deny having heard it. Mr. Williamson attended for the purpose of seeing that the property brought the mortgage debt. He made the first bid, $5,800. The defendant then bid $5,810, and the property was knocked off to him, in the name of his brother W. F. Elgin. There were no other

bids. W. F. Elgin bought under an arrangement be-
tween himself and the defendant that they were to
buy it together. W. F. Elgin was fully aware of
the arrangement which had been made between Taylor
and the defendant. This arrangement was, as de-
fendant repeatedly admits in his cross-examination,
and as is otherwise amply shown in the evidence, that
Taylor should have the right to redeem the property
within a reasonable time, at the price bid and ten
per cent. thereon, which was called profit, and a
reasonable fee to himself; or that the property might
be resold, and, after deducting therefrom the price
bid and the ten per cent. just mentioned, and a reason-
able fee to him, the balance should be paid over to
Taylor, the rents, in either event, to belong to de-
fendant. At this time Taylor believed that he could
soon effect a resale. Within thirty or sixty days after
the expiration of that time, no resale having been
effected, the parties agreed to extend the time for
twelve months for such redemption, or such resale.
When this modification was made defendant's fee was
fixed at $750. A resale was set on foot within that
twelve months, under a proposition made by Mc-
Cormick Furniture Company, but it fell through.
In May, 1910, defendant and his brother, W. F.
Elgin, sold the property for $13,000. Out of this,
$1,000 was paid to the real estate agent who brought
the parties together. This sale was made to one Mrs.
Sledge. She paid $5,000 in cash and provided for
the rest of the purchase money in notes falling due

at subsequent dates.   Defendant and W. F. Elgin discounted these notes and converted them into cash. After deducting the $750 fee and the expenses incurred, there was left $10,000 for division between defendant, his brother, W. F. Elgin, and his brother-in-law, W. F. Wallace, who had become interested in the matter after the purchase by defendant, and W. F. Elgin.   This sum was divided equally between the three parties mentioned, each receiving $3,333.33⅓. The $10,000, of course, included the sum advanced to purchase the property.

The amount bid at the sale was much less than the value of the property.   Defendant states in his deposition that he investigated the matter before the sale, and learned from persons competent to give an opinion that it was worth $8,000.   C. W. Young testifies that it was worth $16,000.   In any view it was worth at least $2,000 more than the amount at which the defendant and his brother purchased it at the sale.

Defendant and W. F. Elgin knew that the property belonged to Mrs. Taylor, and that Taylor was acting for his wife in the negotiations referred to between Taylor and the defendant.   In making these negotiations defendant was acting for his brother W. F. Elgin as well as for himself, the two having agreed to buy the property and defendant acting for both, although, as stated, the bid was actually made in the name of W. F. Elgin.   The trustee's deed, delivered immediately thereafter, however, was made to W. F. Elgin and defendant Frank S. Elgin.

Taylor and wife did not discover until 1915 that the deferred notes executed by Mrs. Sledge had been discounted or cashed in by the two Elgins, and that the proceeds of the resale had thus been realized. On learning this fact he demanded a settlement of defendant and W. F. Elgin. They denied owing anything. Thereupon the present suit was brought against defendant, Frank S. Elgin, who, it appears, attended to the whole matter, collected the money, and divided it between himself and W. F. Elgin and W. F. Wallace.

Frank S. Elgin alone was sued, he being the only resident of the State, and having collected and disbursed the funds as stated. The complainant sought an accounting with the defendant as a trustee.

The defendant's view seems to have been, and seems now to be, that the arrangement stated above amounted to a mere contract to permit a repurchase of the property at farthest within the period of one year from the date of the sale which took place on September 5, 1908; that, inasmuch as there had been no repurchase or resale within that time, complainants had no further claim on the property or on him.

There is another defense advanced to the effect that at the expiration of the twelve months no resale or redemption having been effected, defendant and his associates paid to Taylor for his wife $1,000 in full satisfaction of any further claims they might have. The weight of the evidence on this matter is that Taylor was making continual complaints to Wal-

lace, at Corinth, and, as he said, making life a burden
to him, on the ground that he had lost valuable prop-
erty; that to get rid of these complaints Wallace
agreed to pay Taylor $1,000, and so informed the
two Elgins. They at first declined to pay any part
of this sum. Wallace said that he would pay it
himself and risk getting the money back out of the
property. Thereupon both the Elgins said they
would share the burden with him. They all believed
that this would end any further complaints on the
part of Taylor. There was no contract to the effect
that this money should be paid in extinction of the
equity of redemption. It was only agreed to be paid
in order to quiet Taylor and to relieve Wallace from
his importunities; Wallace having before this time
entertained close business relations with Taylor, and
being under obligations to him for business favors
rendered during Taylor's days of prosperity, and
feeling that he must be relieved of the importunities
referred to. The two Elgins paid to Wallace their
part of the $1,000, but Wallace never paid it to Tay-
lor, nor to Mrs. Taylor. He gave a check for $600
and executed his note for $400, both payable to
Elizabeth Taylor, the daughter of the complainants,
but understood to be for their benefit. Neither the
check nor the note has ever been paid, and Wallace
has refused to pay them. Moreover, the $1,000 was
a wholly inadequate consideration for the extinction
of the equity of redemption, if there was such an
equity existing at or after the expiration of the

twelve months. 1 Jones on Mortgages (7 Ed.), section 340, p. 463; 27 Cyc., 993.

The chancellor held that the transaction amounted to a mortgage, and held defendant liable as a mortgagee, but allowed him credit for all expenses, also ten per cent. per annum as profit on the amount invested, and $750 attorney's fee. He also gave him credit for the $1,000 paid the real estate agent for effecting the sale to Mrs. Sledge. The defendant prayed a broad appeal. The complainant prayed no appeal, but assigned errors upon the credits just mentioned as having been allowed to the defendant; that is, the ten per cent., the attorney's fee, and the $1,000 paid to the real estate agent.

The fundamental question on which the whole controversy turns is whether the facts stated make out a case of sale with liberty of repurchase, or that of a mortgage.

It is often very difficult to distinguish when a state of facts falls within the one or the other category. The matter has been considerably discussed in this State, and we have several cases, some of which discuss the principles involved quite fully and all of which are valuable for purposes of illustration. We shall not review these cases in detail, but only cite them. They are: *Bennet* v. *Holt,* 2 Yerg. (10 Tenn.), 6, 24 Am. Dec., 455; *Scott* v. *Britton,* 2 Yerg. (10 Tenn.), 215, 224, 225; *Lowry* v. *McGhee,* 8 Yerg. (16 Tenn.), 242, 248; *Hickman* v. *Cantrell,* 9 Yerg. (17 Tenn.), 183, 184, 32 Am. Dec.,

396; *Ballard* v. *Jones,* 6 Humph. (25 Tenn.), 455; *Ehert* v. *Chapman,* 8 Baxt. (67 Tenn.), 27; *Blizzard* v. *Craigmiles,* 7 Lea (75 Tenn.), 693, 699; *Bowman* v. *Felts* (Ch. App.), 42 S. W., 810.

The leading cases are *Bennet* v. *Holt, Hickman* v. *Cantrell,* and *Ehert* v. *Chapman.* The latter case contains a full summary of the points which distinguish between a sale with liberty of repurchase and a mortgage. It is said that if there be a striking disparity in value between the property conveyed and the money advanced the probability is that the conveyance was intended as a security or mortgage. In that case it was held that where the amount advanced was $1,000 and the value of the property was $1,500, the disparity was too great to justify a conclusion that the transaction made a sale with liberty of repurchase. Another indication stated is that, if there was no price fixed on the property, the transaction should be characterized simply as a provision for security. Another matter for consideration is whether there was a contract for repaying the money advanced; if so, this is indicative of a mortgage. It is stated that another point for consideration is whether possession remained with the vendor, or passed to the vendee. The opinion continues:

"After enumerating these several symptoms, Judge HAYWOOD says: 'But if the price be settled, and there be not any great disparity between the money advanced and the thing sold, if the receiver of the money be not bound to repay it, and there is no

covenant to that effect, and if possession is delivered to the vendee, then it is a sale, and, being liable to be defeated by paying a certain sum on a certain day, it is a conditional sale.' All these things must concur, otherwise the conveyance is a mortgage.''

The importance of having the exact price fixed to be repaid on the repurchase and of having the exact day fixed is fully shown in *Hickman* v. *Cantrell*, supra. Judge TURLEY there recalls the well-known legal principle that originally at common law all estates which were defeasible by the payment of money on a particular day became absolute, if the day fixed for payment was permitted to pass without payment of the money. This principle was applied to conveyances where the transaction was intended merely as security as well as to those where it was really intended as a sale. From the operation of this principle great abuses arose, resulting in the oppression of debtors. To ameliorate this hardship the distinction was established that, where the transaction was intended as a security for debt, the debt should be considered the principal thing contracted for, and the estate collateral thereto; whereas in the case of a transaction really intended as a sale, the estate should be treated as the principal thing, and the consideration collateral. As a result of this principle it was held that, where the transaction was intended as security, the debt being the principal thing and the estate collateral, the right to redeem should continue, although the day of payment

had elapsed without payment made.   In transactions of this kind there was an obligation to pay, either consisting of a preexisting debt or money advanced at the time.   On the contrary, in the case of a sale with liberty of repurchase, it was pointed out that there was no debt, but the estate was one purely on condition; that is, bound to become absolute, unless the amount agreed upon as the price of repurchase should be paid at the date mentioned; that one holding land subject to a condition for repurchase had no claim for money against the person in whose favor the condition was created; but that his only right was to hold the land and take the benefit of the purchase becoming absolute in case of the other party's failing to effect the repurchase; that in order to effect this repurchase the party seeking to accomplish it must be present on the day and tender the exact amount of money contracted for as the price of repurchase; that in case he failed to make such tender promptly on the day, and exact in amount, the right to repurchase was lost; that, on the other hand, in case a true tender was made and the person to whom it was offered refused it, his estate was lost, the condition having been fully complied with by the tender; and, having no claim on the other person for the money which he had refused, he should take nothing.

Thus it appears that the party who is to make a repurchase with a view to enforcing the condition must know the exact day on which he is to pay, and

the exact amount which he is to pay. Now to apply
the rule to the case before us: Here no exact amount
was fixed. It was to be the purchase price and ten
per cent. interest, to be sure, but there was an at-
torney's fee, and that amount was not fixed; nor
was the day fixed. It was believed by Taylor, and
acquiesced in by defendant, that redemption could
be accomplished, or might be accomplished, within
thirty or sixty days by a resale, during which time
Taylor was to look for purchasers. This was as
near as the parties at that time arrived at fixing a
day. So no day was fixed, and it was impossible for
the Taylors to know exactly what amount they were
to pay, nor the day they were to pay it in order to
effect a repurchase. Later, it is true, as already
stated, the fee was fixed at $750, and an attempt made
to limit the time to twelve months from the original
sale. At the expiration of that time it was possible
to know the exact day for compliance, also the exact
amount to be paid. But if the transaction was at its
inception a mortgage, it could not be changed by the
subsequent extension of time, and an attempt to limit
the mortgagee's right to its expiration, in view of the
long-recognized and constantly applied principle of
equity that a transaction which is once a mortgage
must continue to be so treated. Once a mortgage
always a mortgage. *McGan* v. *Marshall,* 7 Humph.
(26 Tenn.), 121, 124; *Krelinger* v. *New Patagonia,
etc.,* 6 British Ruling Cas., 394, 404, 405, et seq., and
note.

It is true there was no covenant on the part of the Taylors to pay the defendant or his associate the amount to be expended in the purchase of the property, nor as the law stood at the time the transaction took place could Mrs. Taylor have bound herself personally to pay it. However, her agent, John W. Taylor, became personally liable, and likewise the property of Mrs. Taylor, which was the subject of the contract since she could not hold or regain the property without making payment. Again there was a provision for interest, ten per cent. This is spoken of by defendant as a profit on the investment. But this does not change facts. The evidence shows that defendant and his associaties treated this as ten per cent. interest per annum.

As to the disparity between the amount of money advanced in the purchase of the property and the value of the property, this was at least $2,000, and probably very much more. The disparity was too great.

So it appears that of the several points indicated in *Ehert* v. *Chapman* as necessary to exist in concurrence in order to enable one to assign a transaction to the category of a sale with liberty of repurchase, only one is found present; that is, the delivery of the possession to the purchaser at the sale. The authority referred to holds that all of these must be present. The conclusion seems to be inevitable that the transaction was properly held by the chancellor to be a mortgage. A transaction very similar to the present

one, moreover, was held to be a mortgage in the case of *Haywood* v. *Ensley*, 8 Humph. (27 Tenn.), 460. We must therefore overrule defendant's assignment of error upon the chancellor's decree. We may say in passing that in reaching our conclusion upon the facts we have not considered certain contracts executed between W. F. Wallace and J. W. Taylor on May 5, 1909, and August 21, 1909, though we do not make a formal ruling upon the question of their competency, since there is some evidence indicating that Wallace was left to draw up with Taylor a memorandum of the contract. The other evidence referred to as incompetent in defendant's assignment of error we have likewise not taken into consideration in reaching our conclusion.

It remains to deal with the assignments filed by complainant.

The first assignment, as to the ten per cent., and the second as to the $750 attorney's fee, must both be sustained. The defendant should be allowed only six per cent. interest per annum on the sum advanced. The ten per cent. would be usurious, and a clog on the right of redemption. The $750 attorney's fee would likewise be a clog on the right of redemption. It does not appear that any services were performed for which such charges should be made. The third assignment as to the $1,000 paid to the real estate agent for effecting the sale must be disallowed. We think that was a proper expenditure.

Taylor v. Elgin.

There are other credits allowed the defendant in the chancellor's decree which are not excepted to, and against which the complainant has filed no assignment of errors. These matters must therefore stand as fixed in the decree. It is true that the complainants, at the close of their original brief, in making a summary of points, refer to some of these matters as objectionable, but, not being contained in the assignment of errors, they cannot be noticed. Therefore the rights of the parties will be settled on the basis of the chancellor's decree, save only that the ten per cent. per annum, and the $750 attorney's fee, will be disallowed, and in place of the ten per cent. there will be allowed six per cent. interest.

A decree will be entered, taxing the defendant with all the costs of the chancery court, and with two-thirds of the costs of this court. The complainants will pay one-third of the costs of this court.

### On Petition for Rehearing.

The complainant's petition is overruled. The matter on which it is based was disposed of on the ground stated in the last paragraph but one of the original opinion; that is, that such matter was not contained in the assignment of errors. Complainant concedes this, but says it did appear in the latter part of the brief. This was one of the matters we referred to in the paragraph of the opinion just mentioned, and we see no reason to change what we have there written. Having excluded the question of rents from the assignment of errors, the complainant cannot regain

the advantage, thus lost, by general discussion or even particular objection made later in the general argument accompanying the assignment of errors.

The petition of the defendant is also overruled. It is true that complainant, in stating in the bill the contract made between the parties when the defendant and his brother undertook to buy in the property, and hold it for Mrs. Taylor, said that two of the terms were that Mrs. Taylor, in effecting redemption, either directly or through the medium of a sale, was to allow to defendant and his associate ten per cent. per annum on the money invested, and in addition a reasonable attorney's fee, which was later fixed at $750. The bill also charged that by these arrangements the defendant became a trustee for the complainant, and, having sold the property subsequently for $13,000, which was far more than twice the sum paid at the trust sale, and having refused to account to her, that he should be compelled to account, and that, after the allowance of proper credits, the balance found due should be paid over to her. The two credits now claimed, and which we disallowed on the original hearing, were particularly mentioned, and it was asked that they be allowed "if proper;" and there was also a prayer for general relief. We did not overlook the allegations of the bill, as surmised by the learned counsel who drew the petition. It is true the bill was much too long, and very involved, and tedious to the last degree, but we read it all, and annotated it on the margin

in pencil as we read it. We disallowed the two credits for the reasons stated in the original opinion, and those reasons still hold good. If persons who come to the relief of debtors in distressed circumstances be permitted to make such hard bargains with them, and the court is, in law, bound to enforce them, there is then an end of the beneficent powers of a court of equity to succor those whose adversity has made them an easy prey to speculators striving to make profit out of their helplessness. The bargain which defendant and his associates made with Mrs. Taylor, or with her husband for her, which is fully set forth in the original opinion, was a very hard and inequitable one. The complainant stated this contract in the bill, and what had been done under it; how her property had been sold; how it had been bought by the defendant at the court's sale, for her, or to enable her to redeem it, directly, or by a subsequent sale for an advanced price; how the defendant had sold the land at a very enhanced price, and had refused to account to her at all. She asked that he be compelled to account, and that proper credits be allowed him, and that she have judgment for the balance. The court held, in the original opinion, that the transaction amounted to only a mortgage, that is, a loan of the money advanced as the purchase price at the sale, with the land as security for the return of the money, and that ten per cent. interest per annum for the use of the money could not be lawfully allowed under the guise of "profits," nor could a $750 additional

sum be allowed under the form of an attorney's fee, when no services were performed therefor; since such exactions would be mere clogs on the right of redemption, the allowance of which, and of similar exactions upon harassed debtors, would paralyze the arm of a court of equity when raised to strike away the shackles of unfortunate men and women whose financial distress had caused them in struggling out of one prison house to stumble into another.

Defendant urges in his petition that he did not know the fee would be questioned, and therefore had no opportunity of showing the services he performed, and asked that the cause be remanded that he may file such evidence. Defendant is in no situation to make this request. He says in his answer that the contract or arrangement charged in the bill ''is a pure fiction;'' that in the next year after he and his associates had made the purchase, complainant's husband said he could redeem the property for her, and defendant agreed he might do so by repaying the purchase money with ten per cent. interest thereon, and a reasonable attorney's fee, but that nothing ever came of it. Thus he does not claim in his pleadings that he performed any service for the complainant, and the petition substantially admits that there is nothing in the evidence to justify the allowance of such a fee against her. So the question returns to the status given it by the complainant's presentation in the pleadings,

which we have already sufficiently expressed our views upon.

We may add that defendant's own evidence clearly shows that his own conception of the "fee" was of a kind of concession to him by his associates, W. F. Elgin and W. F. Wallace, in view of the fact that he was to look after the matter for them, as well as for himself. We mean by "concession," not that he was not to do something for them, and thereby earn something special for himself in addition to his taking one-third of the profits of the venture — for such it was between the three persons just mentioned—but that none of them had any definite idea, of what such service might be worth, and defendant himself recognized, as may be inferred from his evidence, that they, W. F. Elgin and W. F. Wallace, were conceding him very generous compensation. But, be this as it may, he did not perform any service as attorney for Mrs. Taylor.

We may add, further, that by reason of the complainant's failure to assign errors against the chancellor's allowance of quite a considerable sum of rents collected by the defendant, he has been permitted to retain a very handsome bonus, in addition to the six per cent. lawful interest which we have allowed him, for all he did in the way of extending financial aid to Mrs. Taylor to extricate her from the pit into which she and her husband with her had fallen.

When we perceived that complainants had omitted to specify the rents in their assignments of error, we indulged the thought they desired in this manner, without offending the sensibilities of a court of equity, to delicately grant a credit which the court could not have allowed if the matter had been left to it for decision; but in this it seems from complainants' petition, which we have already disposed of, that we were mistaken. But, at all events, whether by complainants' generosity or through oversight, the defendant has, in fact, been permitted to keep a very pleasing bonus which will fairly compensate him for the loss of a fee, if he was entitled to any. In view of this fact we were much surprised when he filed his petition for rehearing.

Petitions denied.