JOHN A. WILLIAMS and Wife, EVA HOFFMAN
WILLIAMS, Appellants, v. FRED A. BURMEISTER,
Appellee. —338 S. W. (2d) 645.

Western Section at Jackson.   August 31, 1959.

Certiorari Denied by Supreme Court February 5, 1960.

W. H. Fisher, Hanover, Hanover, Hanover & Walsh, Memphis, for appellants.

Robert L. Dobbs, Memphis, for appellee.

CARNEY, J. The appellants, John A. Williams and wife, complainants below, brought a suit against the defendant, Fred A. Burmeister, and others. The bill was entitled "A bill to impress a trust upon realty, or its proceeds, to purge a transaction of usury and to recover usury paid."

The property involved is a lot and industrial-type building conveyed by complainants, Williams and wife, to defendant, Fred A. Burmeister, by deed dated May 12, 1955. The defendant, Burmeister, on December 30, 1955, conveyed the same property to the defendant, Bedford, for the sum of $32,000 receiving $5,000 in cash and retaining a lien on the property for the remaining $27,000 purchase price.

The defendant, Burmeister, had not paid the complainant, Williams, any money directly for the purchase of the building but had advanced funds for the redemption of the property and repairing of the property in the total amount of approximately $20,000 making a net profit of about $12,000. Defendant Bedford and wife were innocent purchasers of the property and all of the parties except the defendant, Burmeister, were discharged prior to trial.

The complainants' theory was that the deed by complainant, Williams, to defendant, Burmeister, was in reality a mortgage to secure the defendant, Burmeister,

the repayment of $35,000 for the loan of about $20,000 which in itself was a usurious contract and that the defendant, Burmeister, by selling the property to Bedford had breached his oral contemporaneous agreement to hold the property in trust for the benefit of the complainants and to apply the net rentals toward the repayment of the usurious indebtedness of $35,000.

The defendant, Burmeister, denied the charges of usury and breach of trust and contended that he purchased the property in good faith and in return gave the complainant, Williams, a contract for the repurchase of the building and lot which contract the complainant, Williams, breached and hence the defendant, Burmeister, was legally justified in selling the property to the defendant, Bedford.

The Chancellor decided in favor of the defendant, Burmeister; dismissed the bill; and the complainants, Williams and wife, have brought this appeal and assigned errors.

The complainant, John A. Williams, is a welder by trade and sometime prior to 1955 had begun the erection of the building on a lot which he owned on Hollywood Street in Memphis, Tennessee. He took in a partner, one Arisio, who furnished funds used in construction of the building. The association with Arisio soon terminated in a lawsuit in Chancery Court and Arisio obtained a judgment against Williams in the approximate amount of $16,000 together with a lien on the building and lot to secure said indebtedness.

Williams was unable to pay the indebtedness and the real estate was ordered sold by the Clerk and Master to

satisfy the judgment. During all this period the complainant, Williams, was working feverishly to obtain a loan on the real estate to satisfy the judgment of Arisio and to complete the building. Williams thought that the property was worth a minimum of $55,000.

He was trying to get a loan of something less than $20,000 of which $16,000 would be used to pay Arisio and the remaining $4,000 to pay the cost of completion of the building, attorney's fees, etc. Several different money lenders showed some interest, discussed the matter with Williams but none of them would actually make the loan. Time was running short; Arisio had already become the purchaser of the property at the sale by the Clerk and Master and the sale was subject to confirmation by the Chancellor.

The defendant, Burmeister, aged 74, according to his printed letterhead, is engaged in "Real Estate, Insurance and Loans." The record indicates that Mr. Burmeister has been very successful in his business transactions; operates on a rather large scale; and is well-versed in the sale of real estate and mortgage transactions.

Sometime about the first of May, 1955, the complainant, Williams, after being turned down by bankers and other private money lenders in his effort to obtain a loan to save his property, finally, in desperation, turned to one Eugene Hibbler, colored, and sought his services to obtain the loan for him agreeing to pay the said Hibbler as a commission the sum of $500 out of the proceeds of said loan. Hibbler communicated with Burmeister. Also the complainant, Williams, had an attorney, one Campbell, now deceased, who was a friend of the defendant, Burmeister. The record is not too clear on this point but

we think the inference can be drawn that both Hibbler and Campbell urged the defendant, Burmeister, to assist the complainant, Williams, in his trouble.

The defendant, Burmeister, manifested interest in the project; through his own attorney, Mr. George Murphy, who has since surrendered his law license, investigated the status of the title of the property and decided to "help" Mr. Williams.

Then followed a series of very unusual and somewhat mysterious legal and financial transactions;

I. John Doe Letter:

On May 12, 1955, a letter was prepared by Eugene Hibbler or George Murphy, attorney for Mr. Burmeister. It was introduced as Exhibit No. 15 to the testimony of Mr. Burmeister who testified that he, Burmeister, was the John Doe referred to in the letter. Mr. Burmeister was of the opinion that Murphy and Hibbler collaborated in drawing the instrument. Later Attorney Murphy denied having drawn the instrument and Eugene Hibbler did not testify.

The letter is as follows:

"May 12, 1955

"Mr. George Murphy, Atty.
"63 North Cleveland
"Memphis, Tennessee

"Dear Sir:

"For and in consideration of this agreement we, Mr. George Murphy and Eugene Hibler for John Doe agree to pay a judgment of $16000.00 and $1500 cash for Mr. and Mrs. John A. Williams in chan-

cery court, Friday May 13, 1955 to secure their property for them. They are to deed said property, 1324 Hollywood Street to John Doe and John Doe does not want the property but so much is involved in the court it is safe and advisable. John Doe in return will sell 1324 Hollywood back to Mr. & Mrs. Williams for $50,000.00 allowing 7 months to pass to keep from paying capital gain tax.

"Mr. & Mrs. Williams paying $300.00 per month on a lease purchase contract and also allowing $50.00 per month to be returned as down payment which amounts to $350 and property will be deeded back to Mr. & Mrs. Williams. $1600.00 is to be used as follows: One thousand ($1000.00) dollars for remodeling and $500.00 to Eugene Hibler for commission. In this way this protects John Doe and Mr. & Mrs. Williams from involving another law suit then we will take up our usual contract on December 7, 1955, as of $300 per month with 6% interest, taxes and insurance to be paid by Mr. & Mrs. Williams on a 5 year period.

"/s/ John A. Williams

"/s/ Eva Hoffman Williams"

II. Warranty Deed to the Building and Lot from Williams and Wife to Burmeister:

Also on May 12, 1955, Williams and wife executed a general warranty deed to the building and lot to the defendant, F. A. Burmeister. This deed was filed for record in the Register's office by Attorney Murphy on June 1, 1955. The deed recited a consideration of $10 and

other valuable consideration. Revenue stamps in the amount of $37.50 were affixed to the deed and a state transfer tax of $37.50 were paid by Burmeister indicating a consideration of $25,000. No money was passed from the grantee, Burmeister, to the grantor, Williams. The status of the legal title to the property on this date was that it had been sold by the Clerk and Master, bought in by Arisio and subject to confirmation by the Chancery Court.

III. Petition of Tender:

On May 19, 1955, John A. Williams and wife filed a petition in the Chancery Court in the original suit between Williams and Arisio being Cause No. 5006 tendering $16,000 in payment of the judgment to Arisio and the costs and asking the court to vacate the previous sale of the property by the Clerk and Master and to revest title in said lot to Williams and wife. The $16,000 was furnished by the defendant, Burmeister.

On May 30, 1955, a final decree was entered in the cause of Williams v. Arisio, Cause No. 56006, setting aside the sale by the Clerk and Master and revesting title to the lot in John A. Williams and wife, Eva P. Williams.

IV. Lease Purchase Agreement:

On May 24, 1955, the complainants, Williams and wife, and defendant, Burmeister, executed a lease purchase agreement also prepared by Mr. Murphy. This agreement provided that Williams and wife were to purchase the lot and building on Hollywood at a total purchase price of $35,000 payable as follows:

1. $335.00 per month for six months beginning June 1, 1955.

2. After said six monthly payments of $335.00 each have been paid, Burmeister agreed to convey the property to Williams and "accept a note in the amount of $34,400.00 secured by a valid first mortgage on the property herein described payable in monthly installments of $300.00 per month beginning January 1st, 1956, including interest at the rate of 6% per annum from December 1st, 1955, for a period of five years with the entire balance due on the 61st payment, as full payment for the property, the payments will also include taxes and insurance as mentioned below.

"The six payments to be made prior to the time that payments are to begin on the mortgage shall be considered rent and failure to make the payments as described shall represent a default under the terms of this agreement and the party of the first part, at his election may declare this contract null and void.

"It is mutually agreed that $50.00 of each of six monthly payments shall be treated as earnest money. In addition to which the payment of $335.00 made on December 1, 1955, shall also be treated as earnest money with the exception of $35.00 which is prepayment of taxes and insurance. It is also understood that $35.00 of the six previous monthly payments mentioned is also a prepayment of taxes and insurance and is not to be considered earnest money or rent."

The lease purchase contract was never placed of record.

V. $34,400 Note and Deed of Trust by Williams and Wife:

On May 25, 1955, Williams and wife executed a deed of trust on the Hollywood property naming the First National Bank of Memphis as trustee securing the following indebtedness:

"But this is a Trust Deed, and is made for the following uses and purposes, and none other; that is to say: The said parties of the first part are justly indebted to Bearer or the holder of the notes hereinafter mentioned, in the sum of Thirty Four Thousand Four Hundred and No/100 _ _ ($34,400.00) Dollars, evidenced by one principal note of even date herewith executed by the parties of the first part, payable to Bearer, with interest from December 1, 1955 at the rate of six per cent (6%) per annum. Said principal and interest are payable in installments in the following manner, to-wit:

"$300.00 on the 1st day of January, 1956 and a like amount on the 1st day of each and every month thereafter up to and including the 1st day of December, 1960 and on the 1st day of January, 1961 the balance of said principal sum and interest from December 1, 1955, which said monthly payments shall be applied monthly to the payment of interest on the balance of the unpaid principal at the rate of six per cent (6%) per annum and any amount remaining after payment of said interest shall be applied in the reduction of principal."

This deed of trust also was prepared by George Murphy, attorney, and acknowledged by him as Notary Pub-

lic on May 26, 1955. It was presented for registration along with the deed from Williams to Burmeister on June 1, 1955, by Mr. Murphy and a state transfer tax of $32.90 paid.

VI. Chattel Mortgage:

On May 30, 1955, Williams and wife also executed a chattel mortgage on certain welding equipment, etc. securing a note in the amount of $1,200 payable to Bearer on or before twelve months which was held by Burmeister up until the date of his testimony on the trial when it was surrendered to the complainant, Williams. It is admitted that no funds were advanced by Burmeister for the $1,200 note. Mr. Williams testified that the note and chattel trust were given as additional security to Mr. Burmeister. Mr. Burmeister testified that the note and chattel trust were given by Williams and accepted by him for the purpose of preventing Mr. Arisio from making any claim against the welding equipment.

VII. Agreement for Work to be Performed:

On May 30, 1955, Burmeister and Williams executed an agreement entitled "Agreement for Work to be Performed." This agreement recited that Mr. Burmeister was the owner of the premises known as 1324 Hollywood Street and that Williams was interested by virtue of a lease purchase contract and that in consideration of Burmeister furnishing the funds to complete the building Williams would supervise the construction, contribute his own labor for the sum of $20 per week and that it was contemplated that only five weeks would be required to complete the building. Murphy prepared this instrument.

VIII. Correction Deed:

On June 22, 1955, Williams and wife executed a correction warranty deed to the real estate to Burmeister. This deed merely recited that John A. Williams was the same person as John Andrew Williams and that Eva Hoffman Williams was the same person as Eva P. Williams.

IX. $30,000 Deed of Trust by Burmeister and Wife:

On June 24, 1955, the defendant Fred Burmeister, and wife, who were then about to make a trip to Europe, executed a deed of trust on the Williams property to secure a note of Burmeister and wife in the amount of $30,000 due and payable on demand to the First National Bank of Memphis. This deed of trust in favor of the First National Bank was filed for record in the Register's office on June 24, 1955, and on the same day the deed of trust of Williams and wife securing the $34,400 note payable to Bearer was marginally released by George W. Murphy who certified that he was the holder of the indebtedness secured thereby. The deed of trust by Burmeister and wife in favor of the First National Bank was released of record on December 30, 1955.

Complainant Williams was never notified that the deed of trust securing the $34,400 note had been released by Mr. Murphy and neither the note nor the deed of trust was ever surrendered to him.

X. Lease of Building to Shelton Transfer and Storage Company:

On July 21, 1955, the defendant, Burmeister, leased the property at 1324 Hollywood to W. P. Shelton Trans-

fer and Storage Company for one year at a monthly rental of $200. This lease contract expressly provided that the money should be payable to Eugene Hibbler to be deposited to the account of Fred Burmeister in the First National Bank. The rights of Williams in the building were not mentioned in this contract.

The lessee, Mrs. Shelton, testified that she made the monthly payments of $200 each by check payable to Burmeister but delivered personally to Eugene Hibbler and that Hibbler looked after the rental and maintenance of the building for the benefit of Mr. Burmeister. By mutual consent she surrendered possession after the property was sold by Burmeister to Mr. Bedford. After the property was sold to Bedford it was leased to a new tenant for the sum of $400 per month.

XI. Notice of Forfeiture:

On Nov. 1, 1955, George W. Murphy, as attorney for Burmeister sent a registered letter to Mr. and Mrs. Williams notifying them that since none of the six payments of $335 each provided for in the lease purchase contract had been paid that Mr. Burmeister was declaring the contract and agreement null and void. Receipt of this registered letter was refused by Mr. and Mrs. Williams.

On December 3, 1955, Mr. Burmeister wrote Mr. and Mrs. Williams a letter over his own signature referring to the fact that none of the six payments of $335 each had been paid and that therefore they had "thus forfeited any and all interests you may have had or thought you had in this property." He also told Mr. and Mrs. Williams to stay away from the property.

XII. Sale of Property by Burmeister and Wife to Bedford:

On December 30, 1955, Burmeister and wife executed a warranty deed conveying the Williams property to Claxton K. Bedford receiving as consideration therefor $5,000 in cash and notes payable to Bearer in the amount of $27,000 with interest secured by a deed of trust on the Williams property.

Upon the trial Mr. Williams testified that only a small amount of additional work was necessary to complete the building for leasing, mainly some welding on one side of the building; that soon after he began his final work the defendant, Burmeister, acting through Hibbler, made him stop, taking his welding equipment away from him and turning it over to one Wolfe who was in business two doors away and finally forbade him to come around the property or have anything to do with it and leased the property to Mrs. Shelton without consultation with or permission of the said Williams.

With reference to his financial transactions with Mr. Burmeister, Mr. Williams testified that he understood his agreement with Mr. Burmeister to be that Burmeister would make the loan to pay off the indebtedness to Arisio and complete the building; that Williams would deed the building to Burmeister and that Burmeister would execute a contract for the resale of the property back to him for $35,000; that Burmeister would rent the building out and apply the net rentals toward the payment of Williams' $35,000 note and when he, Burmeister, had been repaid the full $35,000, Williams and wife would be the owners of the building and lot un-

encumbered. Williams testified that Burmeister told him it would take some thirteen to fifteen years to pay it out.

As to his purpose in executing the deed to Mr. Burmeister, Mr. Williams testified as follows:

"Q. Mr. Williams, what was your reason for deeding the property to Burmeister? A. To obtain that loan.

"Q. Did you have any other purpose, did you deed it to him in order to pass the title to him? A. None except to get that loan.

"Q. Was that your agreement with him? A. Yes."

Further Mr. Williams testified that he had no way to pay the monthly payments called for in the lease purchase agreement except out of the net rentals from the building and that Mr. Burmeister knew that he, Williams, could not pay anything out of his pocket. In addition, Mr. Williams testified that Hibbler assured him at the time the negotiations were going on that the building, when completed, would rent for approximately $400 per month.

The defendant, Mr. Burmeister, testified that Mr. Williams, through Attorney Campbell and Eugene Hibbler, solicited a loan from him on the property; that he became interested, investigated the status of the title and decided that to make a loan on the property would be "literally dynamite;" refused to entertain the question of a loan any further but suggested that he and Williams might get together later and "arrive at a definite conclusion." (Tr. p. 323)

Mr. Burmeister further testified that the idea of a loan was completely forgotten and then he began discussing the lease purchase contract with Mr. Williams, arriving at a definite agreement with him, and that the agreement was put in writing in the form of the lease purchase agreement referred to above, Exhibit 3 to the testimony of Mr. Williams; and that that instrument represented the entire agreement between him and Williams. Further, that Williams never made any of the six payments provided for in the lease purchase agreement though he, Burmeister, repeatedly requested him so to do and that therefore, he, Burmeister, was forced to declare the lease purchase contract forfeited and to sell the property to protect his interests.

His Honor, the Chancellor was of the opinion that the complainants' theory of the case was incredible.

■ Of course, on appeal the case comes to this court with the presumption of correctness of the Chancellor's finding of fact. T.C.A. Section 27-303.

■ However, we respectfully differ with His Honor the Chancellor and find that the evidence preponderates against his finding and in favor of the complainants' theory of the case. To us the testimony of Mr. Williams is quite convincing and seems to be fully corroborated by the actions of all the parties.

"Equity Looks to Substance and Not to Form." We think the evidence is overwhelming that the complainant, Williams, executed the warranty deed in question as a mortgage and only as security for the funds to be advanced for his benefit by the defendant, Burmeister, and only because the defendant, Burmeister, requiring

such deed as a condition to his lending the funds required to redeem the property and complete the building for leasing.

From the case of Harmon v. Faucette, 8 Tenn. App. 137, we copy a quotation from Pomeroy as follows:

" 'In general, all persons able to contract are permitted to determine and control their own legal relations by any agreement which will not be illegal or opposed to good morals or public policy; but a mortgage forms a marked exception to this principle. The doctrine has been firmly established from an appeal had that when the character of the mortgage has attached at the commencement of the transaction, so that the instrument, whatever be its form, is regarded in equity as a mortgage, that character of mortgage must and will always continue; if the instrument is in its essence a mortgage, the parties cannot by any stipulations, however express or positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a mortgage in equity. The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and encumbrance of the mortgage; the equitable right of redemption after default is preserved remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction, purported to cut off this right.'

Pomeroy's Equity Jurisprudence, 4th Ed., Vol. 3, Sections 1192-1193. See Section 1196 when a conveyance absolute on its face may be a mortgage.

"The theory on which equity bases this doctrine is that it abhors penalties and forfeitures. To permit the bank in this instance to forfeit this property upon failure of the debtor to redeem is in equity a penalty."

See also Talyor v. Elgin, 140 Tenn. 602, 205 S. W. 428.

■ In addition to declaring the deed a mortgage this court is also of the opinion that the entire transaction was clearly usurious. Burmeister agreed to advance funds totalling approximately $20,000. In return therefor he was to be repaid the amount of $35,000 together with interest at 6% per annum. He took a note from Williams and wife for $34,400 secured by a deed of trust on this property on May 25, 1955. That Mr. Burmeister says that it was erroneously recorded and the fact that the deed of trust was marginally released on June 24, 1955, the same day that Burmeister executed and recorded the deed of trust securing the loan of $30,000 to the First National Bank, do not change the usurious nature of the transaction in the least.

In the case of Swanson v. White, 1844, 24 Tenn. 373, 378, our court said as follows:

"* * * All attempts to evade the usury laws are watched by the courts with anxious jealousy, and promptly put down. Such attempts as the present are of no new origin; they have been resorted to again and again, in England and the United States, and no doubt in every other country where usury is

forbid; our law-books are full of such cases arising out of them; and they have been universally held to be usurious, no matter what kind of property has been given instead of money, if the design of the parties at the time was that money was to be obtained upon it. Indeed, vain would be our usury laws if such were not the case. I will not lend you money; oh, no, I cannot legally charge more than 6 per cent for money, but I can charge what I please for any property. Here is a negro that you can readily sell for $600; I know a man that will give that price for him; you give me $1,000 and you may have him. What is this but taking $1,000 for the loan and forbearance of $600? Indeed, it is the worst and most dangerous of all attempts at usury, because, generally, the most difficult of detection."

Under the circumstances of this case Burmeister, as mortgagee, occupied a fiduciary relationship toward Williams, mortgagor. See Jones v. Thomas, 41 Tenn. App. 503, 296 S. W. (2d) 646.

■ A trust in real estate may be proven by parol evidence in Tennessee. Kelley v. Whitehurst, 37 Tenn. App. 360, 264 S. W. (2d) 1, and cases cited therein.

■ The preponderance of the evidence sustains the testimony of Mr. Williams that Mr. Burmeister did assure him that he would redeem the property, furnish funds to complete the building and apply the net rentals toward payment of the $35,000 re-purchase price until the building was paid for. Because of the fiduciary relationship between them the breach of said agreement by Mr. Burmeister in selling the property to Mr. Bedford amounts to a breach of trust.

Not only do we find that Mr. Burmeister breached his oral agreement to redeem and save the property for Mr. Williams but it is also our opinion that Mr. Burmeister, at the time he made these assurances, had no intention of fufilling such promises. We think the evidence indicates that Mr. Burmeister saw that Williams was in extremis financially; that he recognized a very substantial equity in the property; that he set about immediately by the several legal documents to get fee simple title to the property in his own name; and that he accomplished his purpose within the short period of six months.

Mr. Burmeister advanced approximately $20,000 on the property about the first of June, 1955; he borrowed $30,000 by deed of trust against the property in June, 1955; he collected $200 per month rental from said property for six months; and then in December, 1955, sold the lot and building for $32,000 to Bedford. Out of these funds the complainant, Williams, owner of the property, was never offered even one single dollar by Mr. Burmeister.

It is not difficult for this court to understand why Mr. Williams would sign a warranty deed and other documents which Mr. Burmeister might have required. His back was to the wall and he felt that he had no alternative. In addition, Mr. Burmeister, by his assurances, lulled Mr. Williams into a false sense of security:

The John Doe letter copied above written by Hibbler or Murphy expressly recites that John Doe (Mr. Burmeister) does not want the property.

434

Mr. Burmeister testified as follows:

"A. I gave Mr. Williams to understand from the very beginning that I didn't want the property, and to satisfy him and to assure him that I wasn't trying to put anything over on him, I was willing to enter into an agreement like this for his own assurance that when the building was completed, he could rest assured, if he complied with his part of the agreement, he would be purchasing this building, and I signed a contract to that effect dated in December." (Tr. p. 328)

Again at page 395 of the Transcript we copy from Mr. Burmeister's testimony:

"A. I had made up my mind definitely there would be no loan considered there if this matter could be handled satisfactorily through this Court by a petition which was entered, then these things would happen, and it was at Mr. Williams' own instance, his assurance that if he deeded this property over to me, what assurance he would have that he would get it back; that was the purpose of this agreement being made up. I didn't want him to think I wanted his property; I told him I didn't want it. I was bargaining for nothing but a headache."

Mr. Burmeister knew full well that Mr. Williams would be in default of the lease purchase agreement from and after June 1, 1955, because he, Williams, had no way of paying any monthly payments except out of the net rentals and the building had not at that time been made ready for occupancy. On the same date that the lease purchase agreement was made, May 24, 1955, Mr. Burmeister, through his attorney, Murphy, took a note from

Williams for $34,400 secured by a deed of trust on the property as contemplated by the lease purchase agreement.

On May 30, 1955, Mr. Burmeister entered into a written agreement with Mr. Williams to furnish the materials necessary to complete the building for occupancy and under this agreement was to advance Mr. Williams only $20 per week for his labor. The only explanation of Mr. Williams, a welder, being willing to work for $20 a week would be that he thought he was improving his own building.

These several instruments were all designed to confuse and deceive Mr. Williams into believing that he was actually saving his building though it would take him thirteen to fifteen years before it would be clear of debt. From the beginning Mr. Burmeister had, by the provisions of forfeiture in the lease contract, what card players sometime call a "lead pipe cinch" to declare the lease purchase contract forfeited at any time he, Burmeister, thought it propitious so to do and thus become the legal owner of the entire fee in the property at a total consideration of approximately $20,000.

Mr. Murphy, who represented Mr. Burmeister in these various transactions and prepared the various documents, testified that Mr. Burmeister told him that he had made up his mind "that he would help these people" and that Mr. and Mrs. Williams seemed very joyful about the fact that they were being "helped" by Mr. Burmeister.

Thus while complainants' bill did not charge the defendant, Mr. Burmeister, with fraud eo nomine but only with a breach of trust, the facts giving rise to the ulti-

mate conclusion of fraud were fully charged and proven and we affirmatively hold that the defendant, Mr. Burmeister, did not act in good faith toward Mr. and Mrs. Williams but sought to and did overreach them by legalistic legerdemain.

"Fraud vitiates and avoids all human transactions, from the solemn judgment of a court to a private contract. It is as odious and as fatal in a court of law as in a court of equity. It is a thing indefinable by any fixed and arbitrary definition. In its multiform phases and subtle shapes, it baffles definition. It is said, indeed, that it is part of the equity doctrine of fraud not to define it, lest the craft of man should find ways of committing fraud which might evade such a definition." Smith v. Harrison, 49 Tenn. 230, 242. See also Brown v. Van Pelt, 37 Tenn. App. 352, 263 S. W. (2d) 956.

Equity Will Undo What Fraud Has Done. Gibson's Suits in Chancery, 5th Edition, Section 57.

Hence, the decree of the learned Chancellor must be reversed and the complainants' bill sustained. The warranty deed from Williams to Burmeister will be declared a mortgage and Burmeister adjudged to be trustee of the $32,000 sale price of the building and lot and $1,200 rental therefrom for the benefit of Complainant Williams and wife. All interest accruing on the $27,000 purchase money note of Bedford will also inure to the benefit of Complainant Williams.

The transaction will be purged of all usury and Mr. Burmeister will be entitled to credit only for the sums actually expended by him in redeeming and/or improving the property of Williams including insurance and taxes paid. Because of his sharp practices Mr. Bur-

meister will not be allowed any interest on his credits for sums actually expended. The $1,100 advanced by Mr. Burmeister for payment of attorneys' fees to Dobbs, Fisher and Campbell will be allowed as a credit.

No credit will be allowed for any commissions or fees paid to Hibbler or Murphy since they collaborated in the scheme to defraud Mr. Williams and no credit will be allowed for the expenses of revenue stamps, transfer tax, and recording fees on any of the documents except the warranty deed which we have declared a mortgage.

Complainant Williams and wife will be awarded a judgment for an amount equal to the difference between the sum of $32,000 sale price, the $1,200 rent and interest accrued and/or collected on the $27,000 purchase money note of Bedford less the net credits to which Mr. Burmeister is entitled as above set out; and a lien will be declared on said $27,000 Bedford note to secure the payment of complainant's judgment.

The cause will be remanded to the Chancery Court of Shelby County for a reference to determine the exact amount of defendant's credits and complainants' judgment; for entry and collection of said judgment and for all other purposes consistent with this opinion.

Defendant Burmeister is taxed with all the costs of this proceeding both in the lower court and this court.

Avery, P. J. (W. S.), and Bejach, J., concur.